STEWART, J.
 

 LThe plaintiffs, Laurence Solow and Allan Katz, appeal a summary judgment dismissing their claims of gross negligence, recklessness, and misrepresentation related to accounting malpractice and violations of the Louisiana Securities Law against Heard, McElroy & Vestal, L.L.P. (hereafter “HMV”), the defendant. Finding that there is no genuine issue of material fact and that summary judgment is warranted as a matter of law, we affirm.
 

 FACTS
 

 This dispute stems from the parties’ dealings with RTIN Holdings, Inc., (hereafter “RTIN”), formerly a publicly-traded corporation based in Longview, Texas. HMV, which is a firm of certified public accountants (“CPA’s”) headquartered in Shreveport, began its involvement with RTIN in August 2002, when it accepted an engagement to audit RTIN’s financial statements for the period ending December 31, 2002. Tim Nielsen was the CPA
 
 *1272
 
 who performed the audit. HMV replaced Michael Killman of Killman, Murrell
 
 &
 
 Co., P.C., (“Killman”) as RTIN’s auditor. Solow’s involvement with RTIN goes back to 2001, when he sold two businesses, Me-dEx Systems, Inc., and Pegasus Pharmacy, Inc., to RTIN. According to Solow, RTIN did not abide by the payment schedule, so he sued to rescind the sale, and he regained ownership of the two businesses. Allan Katz had no direct dealings with RTIN. He was merely a recipient of shares in RTIN through a deal between Solow and RTIN.
 

 |2On March 26, 2003, RTIN filed its annual report, also referred to as its 10-K, with the Securities and Exchange Commission (“SEC”).
 
 [1]
 
 The 10-K included Kill-man’s audit opinion for the 2001 fiscal year and an unidentified audit opinion for the 2002 fiscal year.
 

 Killman contacted RTIN and had his audit opinion pulled from the 10-K. He explained in his deposition that he had questions regarding the financial statements, particularly concerning the recognition of franchise fees as revenue. Killman and Nielsen discussed the revenue recognition issue during a phone call that occurred sometime in late February or early March of 2003. Killman was of the opinion that some of the franchise fees should be deferred, while Nielsen believed that the fees could be recognized as revenue.
 

 On March 27, 2003, RTIN filed an amended 10-K without Killman’s 2001 audit. However, the amended 10-K again included an audit opinion for the 2002 fiscal year. Nielsen explained in his deposition that the audit opinion for the 2002 fiscal year was a draft provided by HMV at RTIN’s request. The draft did not have HMV’s name on it. Moreover, Nielsen had not given it final approval for release, and it should not have been included by RTIN in the 10-K.
 

 HMV received a letter from the SEC dated March 26, 2003, regarding an “informal inquiry” into RTIN. The SEC requested that HMV retain and produce all documents relating to RTIN. The letter stated that the inquiry ^should not be construed as an indication that RTIN had violated the law. The SEC also requested documents relating to RTIN from Killman.
 

 On April 2, 2003, RTIN representatives met with Michael Killman and Tim Nielsen in Longview, Texas. They discussed the revenue recognition issue about which Kill-man and HMV disagreed. Killman refused to release his 2001 audit opinion and turned over his work papers. Nielsen agreed that HMV would go back and conduct an audit for the 2001 fiscal year. Nielsen also learned that HMV’s draft audit opinion for the 2002 fiscal year had been included in RTIN’s March 10-K filings.
 

 On April 3, 2003, Nielsen wrote to Curtis Swanson of RTIN about the inclusion of its draft audit opinion in the March 10-K filings. According to the letter, HMV had not yet issued its opinion but had provided at Curtis Swanson’s request “an unsigned, form audit opinion letter for the 2002 financial statements” on March 25, 2003. Nielsen explained that HMV could not release its audit opinion until he reviewed RTIN’s finalized 2002 financial statements and until RTIN resolved issues concerning a stock conversion of its Class C shares. Nielsen requested that RTIN amend its March filings to remove the audit opinion relating to the 2002 financial statements and to inform RTIN’s shareholders that
 
 *1273
 
 neither HMV nor Nielsen had issued an opinion on the 2002 financial statements. Nielsen indicated in his deposition that a copy of the letter was sent to the SEC through HMV’s attorney.
 

 On April 4, 2003, RTIN and Solow met in Longview and signed a letter of intent for the sale of MedEx and Pegasus. RTIN paid Solow L$100,000. Solow also received two interim payments prior to the sale’s closing of $100,000 and $156,000, and he was paid an additional $900,000 at closing. As other consideration for the sale, shares in RTIN were issued to Solow and a number of his creditors, including Allan Katz.
 

 Solow recalled that Steve Cavender of RTIN showed him 30 to 40 pages of documents at the meeting on April 4, 2003, including financial statements for 2001 and 2002 and an audit opinion. He did not recall whether the audit opinion was signed, but he described it as looking better than one he had seen the previous year. However, he did not recall specific details about the documents, and he did not indicate that his decision to sell MedEx and Pegasus was based on his reliance on any specific document. Solow had no contact or communication with HMV and he had no information to support the allegation that HMV was involved in negotiations of his sale of MedEx and Pegasus to RTIN.
 

 Nielsen first learned of Solow’s prior dealings with RTIN when he began reviewing financial statements for the audit. He recalled hearing about a new deal between RTIN and Solow sometime in March or April 2003. Nielsen denied any involvement in the negotiations between RTIN and Solow. However, he recalled being asked a question about how the transaction might be booked, and he spent 2.75 hours on June 26, 2003, reviewing due diligence reports on MedEx and Pegasus and the sales agreement to gather information to help RTIN with its note disclosure on the transaction for the July 2003 SEC filing.
 

 | sThe sale was completed on June 27, 2003. HMV issued its audit opinion on the 2002 financial statements on July 3, 2003. Nielsen stated that it was substantially the same as the draft opinion released without authorization by RTIN in its March 2003 10-K filings.
 

 In January 2004, Nielsen learned of the SEC’s finding of fraud by RTIN. By letter to Ed Dymtryk, identified as Chief Executive Officer of RTIN, HMV withdrew as RTIN’s auditor. Due to learning that RTIN had likely made materially false and misleading statements or omissions in connection with its 2001 and 2002 financial statements, HMV informed RTIN that it was withdrawing its audit opinion of June 30, 2003, and demanded that RTIN immediately amend is July 2003 10-K filing to redact all references to HMV and the audit opinion. The letter also related that HMV had learned of RTIN’s failure to comply with its request of April 3, 2003, to amend its 10-K filings of March 26 and 27, 2003, to remove the audit opinion letters as HMV had not issued an opinion at that time.
 

 The exhibits in opposition to summary judgment indicate that the SEC informed Nielsen of its intent to recommend the institution of administrative proceedings against him in regard to his involvement with RTIN. However, there is no indication that the matter proceeded any further or that either HMV or Nielsen was found culpable in any of RTIN’s wrongdoing. On March 19, 2004, RTIN filed for Chapter 11 bankruptcy, following the SEC’s institution of civil litigation against it for fraud.
 

 
 *1274
 
 \fíPROCEDURAL HISTORY
 

 Asserting that RTIN’s shares are now worthless and seeking to recover damages, Solow along with Allan Katz and Jack Stolier, two of Solow’s creditors who received RTIN shares as part of his sale agreement with RTIN, filed suit on February 3, 2005, in Orleans Parish against HMV and Curtis Swanson, identified as a former officer and director of RTIN. Pursuant to exceptions of improper venue and improper cumulation of actions, the claims of Solow and Katz were transferred to the First Judicial District Court in Caddo Parish; Stolier’s claims remained in Orleans. See
 
 Solow v. Heard, McElroy & Vestal, L.L.P.,
 
 2005-1028 (La.App. 4th Cir.4/12/06), 937 So.2d 875,
 
 writ denied,
 
 2006-1680 (La.10/06/06), 938 So.2d 80.
 

 The petition delineates three specific claims against HMV, which are set forth as Count 1 (Misrepresentation and Omission), Count 3 (Louisiana Securities Law), and Count 4 (Professional Malpractice and Negligence).
 

 Count 1 alleges that HMV “knew or was reckless, grossly negligent and/or negligent” in not knowing that RTIN’s financial statements and SEC filings contained material misstatements; that HMV knew and intended that the plaintiffs would rely on its audit opinion in connection with the transaction; and that the sale would not have been completed if HMV had disclosed that the March 2003 SEC filings were false and misleading or if it had included a “going concern qualification” in its audit opinion.
 

 17Count 3 alleges that HMV made material misstatements and omissions in connection with the sale that “operated as a fraud or deceit” upon the plaintiffs.
 

 Count 4 alleges recklessness, gross negligence and negligence on the part of HMV in failing to comply with professional auditing standards and the duty of care owed to investors in RTIN knowing they would rely on the services provided.
 

 In its motion for summary judgment, HMV argued that the claims alleged in Count 1 and Count 4 are subject to the privity requirement set forth in La. R.S. 37:91 of the Louisiana Accountancy Act. HMV also argued that plaintiffs would not be able to prove liability for the alleged violations of securities laws, because HMV was neither a “seller” of securities nor a “control person” as to RTIN.
 

 In opposition, the plaintiffs argued that La. R.S. 37:91 applies only to claims of negligence and not to allegations of HMV’s intentional, reckless, and grossly negligent acts. In support of the securities law claims, plaintiffs argued that HMV was a substantial factor in bringing about the sale and that it exercised control over RTIN due to its audit opinion included in the March 2003 10-K. Plaintiffs also argued that a fraud claim under La. R.S. 51:712(D) does not require HMV to be either a seller or control person.
 

 The trial court granted summary judgment in favor of HMV. It determined that plaintiffs would be unable to prove privity, an essential element in establishing liability against an accounting firm. As to the alleged violations of the securities laws, the trial court found that HMV was |snot shown to be a party liable under La. R.S. 51:714(B). Lastly, the trial court found the plaintiffs’ remaining claims to be of insufficient merit to defeat summary judgment.
 

 The plaintiffs filed a motion for a new trial, which the trial court denied. In doing so, the trial court rejected the notion that plaintiffs’ petition alleged fraud by HMV, noting that the only mention of fraud in the pleadings “is very brief and not definitive.”
 

 
 *1275
 
 In this appeal, the plaintiffs seek review of the trial court’s application of the privity requirement of La. R.S. 37:91 to their multiple claims; the rejection of their fraud claim; and the denial of the claims based on violations of the securities law.
 

 DISCUSSION
 

 The summary judgment procedure is favored and is designed to secure the just, speedy, and inexpensive determination of all but specifically excepted actions. La. C.C.P. art. 966(A)(2). We exercise
 
 de novo
 
 review on appeal using the same criteria that govern the trial court’s consideration of a motion for summary judgment.
 
 Suire v. Lafayette City-Parish Consolidated Government,
 
 2004-1459 (La.4/12/05), 907 So.2d 37. If the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law, then summary judgment shall be rendered. La. C.C.P. art. 966(B).
 

 [
 
 aiMisrepresentations, Gross Negligence and Recklessness
 

 The plaintiffs argue that the trial court erred in applying La. R.S. 37:91 to claims other than negligence. The interpretation of La. R.S. 37:91 appears to be a matter of first impression.
 

 La. R.S. 37:91 states:
 

 A. This Section shall apply to all causes of action specified in this Section filed on or after June 18,1999.
 

 B. No action based on negligence brought against any licensee, or any employee or principal of a licensee by any person or entity claiming to have been injured as a result of their justifiable reliance upon financial statements or other information examined, compiled, reviewed, certified, audited, or otherwise reported or opined on by the defendant licensee or in the course of an engagement to provide other services may be brought unless either of the following conditions exist:
 

 (1) The plaintiff is the issuer or successor of the issuer of the financial statements or other information examined, compiled, reviewed, certified, audited, or otherwise reported or opined on by the defendant, and has engaged the defendant licensee to examine, compile, review, certify, audit, or otherwise report or render an opinion on such financial statements or to provide other services.
 

 (2) The defendant licensee was aware at the time the engagement was undertaken that the financial statements or other information were to be made available for use in connection with a specified transaction by the plaintiff who was specifically identified to the defendant licensee, was aware that the plaintiff intended to rely upon such financial statements or other information in connection with the specified transaction, and had direct contact and communication with the plaintiff and expressed by words and conduct the defendant licensee’s understanding of the reliance on such financial statements or other information.
 

 No action may be brought against a CPA unless one of the conditions under the statute is met.
 
 [2]
 
 Plaintiffs did not engage HMV to provide |Klservices, so the first condition set forth in La. R.S. 37:91(B)(1) is not met. The exhibits establish that HMV was not aware when it
 
 *1276
 
 accepted the engagement with RTIN that the financial statements to be audited were to be available for use in connection with the sale of MedEx and Pegasus by Solow. There was also no direct contact or communication between the plaintiffs and HMV. The evidence shows that no basis for liability exists under the condition set forth in La. R.S. 37:91(B)(2).
 

 Because plaintiffs cannot satisfy the privity requirements of La. R.S. 37:91, they argue that it does not apply to their “fraudulent, intentional, reckless and grossly negligent misrepresentation and omission claims that arise from HMV’s actions with respect to RTIN’s financial statements and audit report, and in connection with representations in the Sale Agreement.”
 

 As previously mentioned, the plaintiffs’ claims are set forth in Count 1, Count 3, and Count 4 of their petition. Fraud is alleged in Count 3 in connection with violations of the Louisiana Securities Law; fraud is not alleged in connection with any action that may be covered under the Louisiana Accountancy Act. Therefore, whether La. R.S. 37:91 applies to claims of fraud is not at issue.
 

 Claims involving the violation of professional standards are set forth in Count 1 and Count 4, which allege recklessness, gross negligence and negligence by HMV with regard to misrepresentations and omissions in its audit opinion on RTIN’s financial statements and HMV’s alleged violation of its professional duty of care. These claims stem from the plaintiffs’ |n alleged reliance on the financial statements audited by HMV. If La. R.S. 37:91 applies to these claims, then summary judgment is proper.
 

 Plaintiffs argue that the plain language of the statute limits application of the privity requirement to negligence claims. HMV contends that the statute is not limited to ordinary negligence.
 

 Discerning the intent of the legislature in enacting a statute is the purpose of statutory construction.
 
 SWAT 24 Shreveport Bossier, Inc. v. Bond,
 
 2000-1695 (La.6/29/01), 808 So.2d 294. A law whose language is clear and unambiguous and whose application does not lead to absurd consequences shall be applied as written without further search for the legislative intent. La. C.C. art. 9; La. R.S. 1:4. However, if the language is susceptible of different meanings, then “it must be interpreted as having the meaning that best conforms to the purpose of the law.” La. C.C. art. 10.
 

 We determine the meaning and intent of the law by considering the law in its entirety along with other laws on the same subject matter.
 
 SWAT 24, supra.
 
 A statute should be construed in a manner that is logical and consistent with its express terms, its presumed purpose, and the intent of the legislature in enacting it.
 
 Id.
 
 The construction should give effect to all parts of the statute and render no part superfluous or meaningless.
 
 Id.
 
 When a literal interpretation of the statute would lead to absurd consequences, its letter must give way to the spirit so that the statute is construed to produce a reasonable result.
 
 Id.
 

 | ^Jurisprudence defines gross negligence as follows:
 

 Gross negligence has a well-defined legal meaning distinctly separate, and different, from ordinary negligence. Gross negligence has been defined as the “want of even slight care and diligence” and the “want of that diligence which even careless men are accustomed to exercise.” It has also been termed the “entire absence of care” and the “utter disregard of the dictates of pru
 
 *1277
 
 dence, amounting to complete neglect of the rights of others.” Additionally, gross negligence has been described as an “extreme departure from ordinary care or the want of even scant care.” [Internal citations omitted.]
 

 Roton v. Vernon E. Faulconer, Inc.,
 
 42,452, p. 9 (La.App.2d Cir.10/3/07), 966 So.2d 790, 795,
 
 writ denied,
 
 2007-2165 (La.1/7/08), 973 So.2d 724.
 
 See also Rabalais v. Nash,
 
 2006-0999 (La.3/9/07), 952 So.2d 653.
 

 Recklessness or reckless disregard is the same as gross negligence.
 
 Rabalais v. Nash, supra; State v. Ritchie,
 
 590 So.2d 1139 (La.1991). Ordinary negligence and gross negligence are distinguished by the degree of lack of care on the part of the tortfeasor.
 
 Foshee v. Louisiana Farm Bureau Cas. Ins. Co.,
 
 41,842 (La.App.2d Cir.1/31/07), 948 So.2d 1171,
 
 writ denied,
 
 2007-0483 (La.4/20/07), 954 So.2d 169.
 

 Though gross negligence and ordinary negligence have distinct meanings, they are both forms or different degrees of negligence. The lack of care on the part of the tortfeasor distinguishes ordinary negligence from gross negligence. La. R.S. 37:91 refers to actions “based on negligence.” The statute does not distinguish between the degrees of negligence or limit itself to ordinary negligence.
 

 Plaintiffs argue that the legislature purposely limited the privity requirement to acts of negligence thereby imposing broader liability for more culpable conduct. They analogize La. R.S. 37:91 to La. R.S. 11S9:2796(A), which holds Mardi Gras krewes liable for “loss or damage caused by the deliberate or wanton act or gross negligence of the krewe ...,” while limiting liability for ordinary negligence. The Mardi Gras statute is but one in a line of statutes, La. R.S. 9:2791
 
 et seq.,
 
 addressing limitations on liability. A survey of these statutes shows that the legislature was explicit in imposing liability for willful or wanton acts, intentional acts, and gross negligence, while generally limiting liability for ordinary negligence.
 
 [3]
 

 In crafting La. R.S. 37:91, the legislature did not explicitly carve out an exception to allow liability for gross negligence or recklessness. It did not distinguish ordinary negligence from gross negligence or recklessness. We find that the privity requirement of La. R.S. 37:91 applies equally to claims of ordinary negligence, gross negligence and recklessness as asserted by plaintiffs in Count 1 and Count 4 of their petition.
 

 Our interpretation is supported by the legislative history of Acts 1999, No. 473, which indicates that the intent was to specify that all causes of action would be governed by the privity of contract provisions and to provide for the conditions under which an action based on negligence could be brought against an accountant. (See House Bill No. 1810.) This intent is evident in La. R.S. 37:92, which states, in part, “The scope of the duty of a licensee or an employee or principal of a licensee to clients and nonclients |, 4shall be determined exclusively by R.S. 37:91, regardless of the domicile of the parties involved.” We interpret this as meaning that an ac
 
 *1278
 
 countant who is licensee under the Louisiana Accountancy Act owes a duty only to persons who engage the licensee to provide services as expressed in La. R.S. 37:91(B)(1) and to persons who meet the criteria of La. R.S. 37:91(B)(2). The plaintiffs are neither. Whether a duty is owed is a question of law.
 
 Barrie v. V. P. Exterminators,
 
 625 So.2d 1007 (La.1993);
 
 Harris v. Pizza Hut of Louisiana, Inc.,
 
 455 So.2d 1364 (La.1984). Therefore, under the applicable laws, HMV owed no duty to the plaintiffs who were neither clients nor nonclients who meet the criteria of La. R.S. 37:91(B)(2). Absent any duty to plaintiffs and based upon our finding that the privity requirement applies to causes of action alleging gross negligence and recklessness, HMV is entitled to summary judgment on the claims asserted in Count 1 and Count 4 of their petition.
 

 Having thoroughly reviewed this nine-volume record, we also find that summary judgment on the claims asserted in Count 1 and Count 4 is proper for the reasons that the plaintiffs will not be able to meet the evidentiary burden of proving that HMV’s actions were grossly negligent, reckless, or intentional.
 

 In
 
 Roton, supra,
 
 the following definition was given for an intentional act:
 

 The meaning of “intent” is that the person who acts either (1) consciously desires the physical result of his act, whatever the likelihood of that result happening from his conduct; or (2) knows that result is substantially certain to follow from his conduct, whatever his desire may be as to that result. Thus, intent has reference to the consequences of an act | ^rather than to the act itself. Only where the actor entertained a desire to bring about the consequences that followed or where the actor believed that the result was substantially certain to follow has an act been characterized as intentional.
 

 “Substantially certain to follow” requires more than a reasonable probability that an injury will occur and “certain” has been defined to mean “inevitable” or “incapable of failing.” Further, mere knowledge and appreciation of a risk does not constitute intent, nor does reckless or wanton conduct by an employer constitute intentional wrongdoing.
 

 Roton,
 
 42,452, p. 9-10, 966 So.2d at 795.
 
 See also White v. Monsanto Company,
 
 585 So.2d 1205 (La.1991). Intentional misrepresentation is essentially fraud-a misrepresentation or suppression of the truth made with the intention of obtaining an unjust advantage for one party or causing a loss or inconvenience to the other. La. C.C. art.1953.
 

 Plaintiffs’ complaints begin with HMV’s failure to talk to Killman, RTIN’s former auditor, before accepting the engagement. While there was no communication prior to accepting the engagement, Nielsen did have two discussions with Killman before completing the audit. They spoke prior to RTIN’s March 2003 10-K filing and met in Longview, Texas on April 2, 2003. They discussed Killman’s concerns, including the recognition of franchise fees as revenue. The two accountants had a professional difference of opinion. Though plaintiffs complain that HMV failed to heed Kill-man’s warning about the SEC investigation, HMV had already learned of the SEC’s inquiry into RTIN by a letter dated March 26, 2003.
 

 Killman’s deposition does not support the claim that HMV violated professional standards in conducting the 2002 audit or otherwise. Plaintiffs complain that HMV should have included a “going concern” qualification in its audit opinion just as Killman had included in the opinion on RTIN’s |1(⅞2001 financial statements.
 
 *1279
 
 There is no evidence to support this claim. Killman explained that the “going concern” qualification in his 2001 audit was based on losses sustained by RTIN’s restaurant operations. The aspects that led to the qualification in 2001 were not present in 2002. RTIN had entered the pharmacy business, was no longer involved in restaurants, and had “morphed” into something else.
 

 The depositions of Killman and Nielsen do not demonstrate that HMV acted with recklessness, gross negligence or intent to misrepresent with regard to the failure to have initial contact with Killman or to include a going concern qualification in the draft audit opinion.
 

 Plaintiffs’ other claims are based on their purported reliance on the draft audit opinion included by RTIN in its 10-K filings for March 2003. HMV did not authorize the draft audit opinion for inclusion in the 10-K. The draft opinion was not signed and did not identify the auditor. When HMV learned that the draft opinion had been included in RTIN’s 10-K, Nielsen wrote to RTIN on April 3, 2003, requesting removal of the draft opinion from the filing. Nielsen also spoke to Steve Cavender of RTIN, who indicated that the draft had been included by mistake. Because HMV had not authorized RTIN to include the draft opinion in its filing and because HMV requested removal of the opinion from the 10-K, there is no factual support for the claim that HMV intended for plaintiffs to rely on the draft opinion in agreeing to the sale. Even the language in the sale agreement warranting that all required documents had been filed with the SEC and that they contained no untrue statement of material fact cannot | nprove intent to misrepresent on the part of HMV. The fact that HMV did not authorize inclusion of the draft opinion in the 10-K and that it asked RTIN to remove it belies the claim that it intended plaintiffs to rely on its contents. Nor is there factual support to show that Nielsen knew the March 2003 10-K filings otherwise included misrepresentations and omissions regarding RTIN’s financial position. Like Solow, HMV was unaware of the fraud being perpetrated by RTIN. Nothing in the record suggests that HMV’s failure to detect the fraudulent conduct through its audit was grossly negligent, reckless, or intentional.
 

 Plaintiffs’ main complaint about the purported audit opinion is that it did not include a “going concern” qualification. As previously addressed, there is a lack of evidentiary support for the claim that HMV was grossly negligent, reckless, or guilty of intentional misrepresentation in failing to include the going concern qualification. Moreover, the exhibits show that the purported audit opinion included in the amended 10-K filed on March 27, 2003, addressed the going concern issue and the replacement of Killman by HMV. The draft opinion notes that the financial statements were presented on the basis that RTIN would continue as a going concern. However, it explains that RTIN incurred operating losses in 2001 and that the “continuance of such losses creates an uncertainly (sic) as to the Company’s ability to continue as a going concern.” It makes clear that RTIN’s ability to continue as a going concern was dependent on the success of steps taken to reduce expenses and increase revenue. It also explains that HMV replaced Killman and that Killman’s audit included the going concern | ^qualification, whereas HMV’s did not. Even though the draft opinion did not include a “going concern” qualification, it did provide notice that the qualification had been included in the 2001 audit and that issues remained regarding RTIN’s ability to continue operating as a going concern. Therefore, if Solow indeed reviewed the 2002 audit opinion, that did not
 
 *1280
 
 even identity the auditor, in agreeing to sell his businesses for the second time to RTIN, then he would have been informed of potential problems concerning RTIN’s prospects.
 

 For these reasons, we find that plaintiffs will not be able to meet their evidentiary burden at trial of proving that HMV acted with gross negligence, recklessness or intent as alleged in Count 1 and Count 4 of the petition. Although summary judgment is seldom appropriate for determining subjective facts of motive, intent, good faith, knowledge, or malice, it may be granted on such issues when there is no issue of material fact concerning the pertinent intent.
 
 Jones v. Estate of Santiago,
 
 2003-1424 (La.4/14/04), 870 So.2d 1002. The evidence does not create an issue of material fact as to whether HMV acted with a total absence of care or utter disregard for the rights of others. Nor does it show that HMV either consciously desired to harm plaintiffs or knew that they would sustain losses as a result of its actions. Considered in light of the evidence on summary judgment, the claims of gross negligence, recklessness, and intentional misrepresentation appear as attempts to circumvent the privity requirement of La. R.S. 37:91. Summary judgment was properly granted on these claims.
 

 h¡^Louisiana Securities La%e Claims
 

 Plaintiffs argue that the trial court erred in granting summary judgment on their claims based on the Louisiana Securities Law, La. R.S. 51:701
 
 et seq.
 
 They assert that the trial court did not recognize that HMV may be directly liable under La. R.S. 51:712(A) and (D) and indirectly liable as a “control” person under La. R.S. 51:714(B).
 

 The plaintiffs’ first claim is based on La. R.S. 51:712(A)(2), which addresses the fraudulent sale of securities by making it unlawful:
 

 (2) To offer to sell or to sell a security by means of any oral or written untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, if such person in the exercise of reasonable care could not have known of the untruth or omission.
 

 As an initial point, we note that under the terms of the sale agreement between So-low and RTIN, Solow is the seller of the shares in MedEx and Pegasus; RTIN is the buyer. Shares in RTIN make up some consideration for the sale in addition to cash payments to Solow of over $1 million. Even if RTIN is considered a seller for purposes of this statute, HMV is not.
 

 In support of its argument that HMV is a seller of securities for purposes of La. R.S. 51:712(A)(2), plaintiffs cite the substantial factor test set forth in
 
 Pharo v. Smith,
 
 621 F.2d 656 (5th Cir.1980). This case does not address the statute at issue. Most importantly, it does not support the plaintiffs’ argument. The
 
 Pharo
 
 court explained that a seller for purposes of the federal securities provision at issue in that case included one in privity with the purchaser and one whose participation in the transaction was a insubstantial factor in causing it to take place.
 
 Pharo, supra.
 
 The court explained that merely participating in the events leading up to the transaction is not enough to make one a seller.
 
 Id.
 

 Plaintiffs argue that HMV was a substantial factor in causing the sale to take place because it prepared the “false 2002 financial statements and audit reports, and knew they were included in the public filings.” This argument overlooks the facts that HMV had not completed its audit, had not authorized RTIN to include
 
 *1281
 
 the draft opinion in its March 2003 10-K filings, and had asked RTIN to amend the filings to remove the draft audit opinion. There is no evidence to support the claim that HMV offered to sell or sold securities or was a substantial factor in the sale involving RTIN and Solow. HMV had no contact with Solow and was not involved with the negotiations between Solow and RTIN. HMV’s participation in the sale was limited to Nielsen’s review on June 26, 2003, of the sale agreement and the due diligence reports on MedEx and Pegasus to assist RTIN in preparing its note disclosures on the transaction and his response to a question by a person with RTIN seeking guidance on how to book the transaction. This limited participation in the events leading up to the transaction does not create an issue of fact as to whether HMV was a substantial factor in causing the sale to take place.
 

 Plaintiffs argue that even if HMV is not directly liable as a seller, it is liable as a “control” person under La. R.S. 51:714(B), which states:
 

 B. Every person who directly or indirectly controls a person liable under Subsection A of this Section, every general partner, executive, officer, or director of such person liable under Subsection A of this Section, every person occupying a |ai similar status or performing similar functions, and every dealer or salesman who participates in any material way in the sale is liable jointly and severally with and to the same extent as the person liable under Subsection A of this Section unless the person whose liability arises under this Subsection sustains the burden of proof that he did not know and in the exercise of reasonable care could not have known of the existence of the facts by reason of which liability is alleged to exist. There is contribution as in the case of contract among several persons so liable.
 

 Subsection A of La. R.S 51:714 provides for civil liability for any person who violates La. R.S. 51:712(A). The term “control” is defined as “the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.” La. R.S. 51:702(4).
 

 Plaintiffs claim that HMV controlled RTIN’s actions with respect to the sale and that it had the power to halt the sale. This argument is based on HMV’s power as auditor to authorize the release of its opinion on RTIN’s financial statements and its failure to ensure that its draft opinion was withdrawn from the March 2003 10-K filings. Again, we note that plaintiffs’ argument is mistakenly framed as though RTIN was the seller rather than Solow. Nevertheless, there is no evidence to indicate that HMV exercised control over RTIN as required under La. R.S. 51:714(B). There is no showing that HMV had the power to direct the management and policies of RTIN. The language of La. R.S. 51:714(B) indicates that a person who exercises control refers to a general partner, executive, officer, director, or a person occupying a similar status or performing a similar function. HMV occupied no such status and performed no such function in relation to RTIN. There is no support for this seemingly frivolous claim.
 

 122Lastly, plaintiffs assert a claim based on La. R.S. 51:712(D), which provides that it is unlawful for any person, in connection with the offer, sale, or purchase of any security, to directly or indirectly employ a device, scheme or artifice to defraud or to engage in any transaction, act, practice, or course of business that operates as a fraud or deceit upon the purchaser or seller.
 

 
 *1282
 
 La. R.S. 51:714, which provides for civil liability arising from the sale of securities, makes no provision for liability based on a violation of La. R.S. 51:712(D). Rather, civil liability is based on the fraudulent sale of securities under La. R.S. 51:714(A). Moreover, we have already addressed the claim of intentional misrepresentation and found that plaintiffs have not shown that they will be able to meet the burden of proving intent to defraud at trial. HMV cannot be held liable for fraud where it did not authorize the release of the draft opinion purportedly relied upon by Solow in agreeing to the sale, and where it asked RTIN to remove the draft opinion from its March 2003 10-K filings.
 

 For these reasons, we find that the trial court was correct in granting summary judgment on the securities law claims.
 

 CONCLUSION
 

 Because there is no genuine issue of material fact and because summary judgment is warranted as a matter of law, we affirm the trial court’s judgment dismissing the claims of Laurence Solow and Allan Katz against Heard, McElroy & Vestal, L.L.P.
 

 AFFIRMED.
 

 [1]
 

 . The SEC requires the filing of an annual report with audited financial statements to give a comprehensive overview of a company's business and financial condition. The form used to file the report is the 10-K. See
 
 http://www.sec.gov; answers/form! Ok. him.
 

 [2]
 

 . A licensee under La. R.S. 37:91 refers to the holder of a license in the form of an active certificate of certified public accountant or a CPA firm’s permit to practice issued in accordance with the Louisiana Accountancy Act. La. R.S. 37:73(7) and (8).
 

 [3]
 

 . For example, see La. R.S. 9:2796.1 (no cause of action against organizations presenting St. Patrick's Day parades or other parades in connection with ethnic celebrations, except for loss caused by deliberate and wanton act or gross negligence); La. R.S. 9:2799(A)(1) (no cause of action against food bank for damages caused by condition of food, except for damages from intentional act or omission or gross negligence); and La. R.S. 9:2799.5 (no cause of action relating to gratuitous services by healthcare provider in community clinic, except for acts of gross negligence and willful or wanton misconduct.)