# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 31, 2021

Lyle W. Cayce
Clerk

No. 20-30654

FIREFIGHTERS' RETIREMENT SYSTEM; MUNICIPAL EMPLOYEES RETIREMENT SYSTEM OF LOUISIANA; NEW ORLEANS FIREFIGHTERS' PENSION & RELIEF FUND,

*Plaintiffs—Appellants*,

*versus*

CITCO GROUP LIMITED; CITCO FUND SERVICES (CAYMAN ISLANDS), LIMITED; CITCO BANKING CORPORATION, N.V.,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:13-CV-373

Before OWEN, *Chief Judge*, and GRAVES and HO, *Circuit Judges*.

PER CURIAM:[*]

Three pension plans invested in a hedge fund that went bankrupt. The pension plans then sued that hedge fund, as well as various Citco Group entities that provided administrative and lending services to the hedge fund.

---

[*] Pursuant to 5TH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIRCUIT RULE 47.5.4.

No. 20-30654

The plans contend that the Citco entities are liable as "control persons" under Louisiana securities law. We agree with the district court that none of the Citco entities are control persons and therefore affirm.

## I.

In April 2008, the pension plans purchased $100 million in shares issued by FIA Leveraged Fund (Leveraged), a Cayman Islands hedge fund. Leveraged was created by a hedge fund manager named Alphonse Fletcher, Jr., who managed Leveraged's investments through his investment management firm, Fletcher Asset Management. Fletcher invested Leveraged's assets in the Fletcher Income Arbitrage Fund, another hedge fund he controlled.

Leveraged was run by a board of directors, which made all of the fund's management decisions. The board entered into an agreement with Fletcher Asset Management to serve as Leveraged's investment manager. That agreement gave Fletcher Asset Management full authority over Leveraged's investments.

Leveraged's board also contracted with various The Citco Group Limited entities to help run the fund. It contracted with defendant Citco Fund Services, which served as the fund's administrator, and defendant Citco Banking, which maintained a credit facility for the fund. The third defendant, The Citco Group Limited, is the parent company of Citco Fund Services and Citco Banking.

As fund administrator, Citco Fund Services' responsibilities included various administrative functions, such as keeping books and records, processing paperwork, maintaining lists of investors, preparing financial statements, and calculating the net asset value of Leveraged's shares.

No. 20-30654

As the fund's source of credit, Citco Banking loaned Leveraged $20 million dollars. At the time, it was Citco Banking's largest loan. In 2007, before the pension plans purchased shares of Leveraged, Citco Banking became concerned with Leveraged's financial situation. Leveraged's financial issues caused Citco Banking to call default on the loan and cancel it in December 2007. However, Citco Banking later renewed the loan when the offering to the pension plans materialized. The loan was eventually repaid with funds from that offering.

When it came time to issue new shares to the pension plans, Fletcher Asset Management's counsel advised that it should get consent from Leveraged's shareholders before issuing new shares, as a "belt[] and suspenders." Leveraged had both voting shares and non-voting shares. As explained by the offering memorandum provided to the pension plans, Leveraged's voting shares were "held by Millennium (Cayman Islands) Foundation, an affiliate of the Administrator," Citco Fund Services. Millennium's consent form was signed by Citco Fund Services' head of compliance and operations, Wiekert Weber. Leveraged's non-voting shares were held by The Richcourt Group, a fund that held investments for other funds. Richcourt's majority owner was Citco Trading, who is not a defendant in this case.

On April 1, 2008, the funds purchased $100 million in voting shares issued by Leveraged.

In June 2011, the pension plans sought to redeem their investment. Leveraged responded by issuing promissory notes instead of providing the plans with cash. Both Leveraged and Fletcher Income Arbitrage Fund eventually filed for bankruptcy. *See In re FIA Leveraged Fund*, No. 14–10093 (Bankr. S.D.N.Y. Feb. 27, 2014); *In re Fletcher Income Arbitrage Fund Ltd.*, No. 14–10094 (Bankr. S.D.N.Y. Feb. 27, 2014).

In March 2013, the pension plans filed a lawsuit in Louisiana state court against Fletcher Asset Management, Leveraged, the Citco defendants, and some other entities. Relevant here, the funds alleged that the offering memorandum contained "numerous material omissions of fact," most notably that the Citco defendants received $50 million from the offering in the form of fees and repayment of the loan, as well as information regarding Leveraged's financial condition. The pension plans alleged that the Citco defendants were liable under Louisiana securities law as "control persons" of Leveraged. The Citco defendants removed the suit to the Middle District of Louisiana. *See Firefighters' Ret. Sys. v. Citco Grp. Ltd.*, 796 F.3d 520, 528 (5th Cir. 2015) (reversing the district court's decision to remand the case to state court).

The district court granted the Citco defendants' motion for summary judgment, holding that they were not control persons under Louisiana securities law. The pension plans now appeal.

## II.

We review a district court's ruling on a motion for summary judgment de novo, applying the same standards as the district court. *See Yeager v. City of McGregor*, 980 F.2d 337, 339 (5th Cir. 1993). Summary judgment is appropriate if there is "no genuine dispute as to any material fact," even after giving the pension plans the benefit of all reasonable inferences in the record, and the Citco defendants are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). *See, e.g.*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Louisiana law imposes liability on those who make false statements or omit material facts in connection with the sale of securities. LA. REV. STAT. § 51:712(A)(2). It imposes liability on the "primary violators"—the entity actually selling the security who violates the law—as well as "control

persons" of those violators. *Id.* § 51:714. Louisiana's control-person liability statute reads:

> Every person who directly or indirectly controls a person liable under . . . this Section . . . is liable jointly and severally with and to the same extent as the person liable under . . . this Section unless the person whose liability arises under this Subsection sustains the burden of proof that he did not know and in the exercise of reasonable care could not have known of the existence of the facts by reason of which liability is alleged to exist.

*Id.* § 51:714(B). "Control" "means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Id.* § 51:702(4).

Because Louisiana precedent on control-person liability is "thin," "we look to federal law for instruction." *Heck v. Triche*, 775 F.3d 265, 283 (5th Cir. 2014) ("In determining who is a 'control person,' the Fifth Circuit similarly construes the control person provisions in Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o, and Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a)."). In *Heck*, the court explained that "[c]ontrol person liability does not require participation in the fraudulent transaction." *Id.* (citing *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 (5th Cir. 1981)). "But a plaintiff 'must at least show that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based.'" *Id.* (quoting *Meek v. Howard, Weil, Laboisse, Friedrichs, Inc.*, 1996 WL 405436, at *3 (5th Cir. June 25, 1996) (per curiam)).

The alleged primary violations in this case are material omissions from the offering memorandum. So to establish that the Citco entities were

control persons, the pension plans must show that they had the ability to control the content of the offering memorandum. We agree with the district court that the plans have failed to make such a showing.

Citco Fund Services provided back-office administrative services to Leveraged. The pension plans argue that Citco Fund Services is a control person because it "knew of the omissions and had the ability to prevent the issuance of the misleading financial statements," which "contained material making the offering memorandum . . . misleading."

This court recently rejected a similar argument in *Ahders v. SEI Private Trust Company*, 982 F.3d 312 (5th Cir. 2020). In that case, investors sued an asset management firm that provided administrative services to the primary violator, such as "sending account statements to clients, reporting income and other details to the IRS, and providing a platform and operations for [retirement accounts]." *Id.* at 314. Like the pension plans, the investors argued that the asset management firm was a control person because it "had the ability to deny its platform to [the primary violator]" and "retained the ability to decline to send the [financial] statements" that allegedly misrepresented the value of the security at issue. *Id.* at 316–17. The court rejected this argument, holding that the "control-person provision requires more than the power to stop a primary violation for an entity to be liable"— it requires "the power to direct . . . the management and policies" of the primary violator. *Id.* at 316 (quoting La. Stat. Ann. § 51:702(4)). It explained that the "power to stop the primary violation is not sufficient, standing alone, to establish a genuine dispute of material fact that [the defendant] had control over [the] primary violations." *Id.*

So too here. Just because Citco Fund Services could have stopped providing its services to Leveraged does not mean that it had the "power to

direct or cause the direction of the management and policies of [Leveraged]." LA. REV. STAT. § 51:702(4).

The pension plans argue that *Ahders* is distinguishable because the asset management firm in that case did not participate in valuing the securities. Here, the offering memorandum stated that "[v]aluations will be made by the Administrator [Citco Fund Services] and the Investment Manager, [Fletcher Asset Management] in consultation with the Board of Directors." But the fact that Citco Fund Services provided accounting services to Leveraged does not establish that it had the "power to direct or cause the direction of the management and policies of [Leveraged]." LA. REV. STAT. § 51:702(4); *Solow v. Heard McElroy & Vestal, L.L.P.*, 44,042 (La. App. 2d Cir. 4/8/09); 7 So. 3d 1269, 1281 (holding that auditors were not control persons based on their "power to halt the sale" or their power to "authorize the release of its opinion on [the primary violator's] financial statements"). *See also Heck*, 775 F.3d at 285 (recognizing that *Solow*'s reasoning "is surely a correct interpretation of the control person statute"). Nor does this fact establish that Citco Fund Services had the power to control the content of the offering memorandum. *See Heck*, 775 F.3d at 283.

Next, the pension plans claim that Citco Banking is a control person by virtue of its loan to Leveraged. By calling default on its loan to Leveraged before the offering, the plans argue, Citco Banking could have rendered Leveraged insolvent and prevented the offering. *Ahders* forecloses this argument, too: "[the] power to stop the primary violation, standing alone" does not establish control-person status. 982 F.3d at 316. If it did, any number of entities that could have prevented Leveraged from operating, like its power company or landlord, might be control persons. *Id. See also Paracor Fin., Inc. v. Gen. Elec. Cap. Corp.*, 96 F.3d 1151, 1162 (9th Cir. 1996) ("[C]ourts addressing this situation have been very reluctant to treat lenders as controlling persons of their borrowers.").

Lastly, the pension plans assert that Citco Fund Services and The Citco Group had the ability to control Leveraged through their relationship with Millennium, which held all of Leveraged's voting shares. The pension plans make much of the district court's statement that Millennium was a "wholly owned subsidiary of Citco Group." But that statement does not appear to be a finding of fact. Rather, the district court went on explain that the pension plans "do not offer evidence of the nature the Citco Defendants' affiliation and alleged control beyond the repeated assertion that Millennium is a 'wholly owned subsidiary of Citco Group.'" It faulted the plans for "not elaborat[ing] on interactions between the Citco Defendants and Millennium."

The only evidence the plans *did* adduce regarding the Citco entities' relationship with Millennium is the offering memorandum, which says that Millennium is an "affiliate" of Citco Fund Services, and the fact that a Citco employee signed a form consenting to the offering on behalf of Millennium.[1]

Even when viewed in the light most favorable to the pension plans, this evidence is insufficient to establish control-person liability.

That a Citco employee, in his personal capacity, provided Millennium's consent to the offering establishes at most that the employee had some control over Millennium, not that any Citco entity did. And it certainly does not establish that any of the Citco entities had the ability to control Leveraged. To the contrary, the evidence suggests that Millennium

---

[1] The pension plans also argue that The Citco Group could have stopped the offering by telling Citco Trading to direct The Richcourt Group—which held Leveraged's non-voting shares—to withhold its consent to the offering. The plans emphasize the fact that Ermanno Unternaehrer, a member of The Citco Group's executive committee, provided Richcourt's consent. But the plans fail to explain why the consent of a non-voting shareholder was necessary for the offering and, in any event, the power to stop an offering, by itself, does not establish control-person status. *See Ahders*, 982 F.3d at 316–17.

held Leveraged's voting shares for administrative convenience to ensure that Leveraged could operate as a Cayman Islands entity. The plans do not dispute that Fletcher Asset Management—not any of the Citco entities— had "full power and authority" over Leveraged's investment program and "complete discretion" over the purchase or sale of assets.

That Citco Fund Services is an "affiliate" of Millennium, without more, is insufficient to establish that any of the Citco entities had "the power to direct or cause the direction of the management and policies of [Leveraged]," LA. REV. STAT. § 51:702(4), much less the power to control the content of the offering memorandum. *See Heck*, 775 F.3d at 283.[2]

\* \* \*

The pension plans fail to establish a genuine dispute of material fact that any of the Citco entities were control persons of Leveraged. Accordingly, we affirm the district court's judgment granting the Citco entities summary judgment.

---

[2] Because we find that the pension plans fail to establish control-person liability based on the principles in *Heck* and *Ahders*, we need not address the Citco entities' argument that control-person liability requires control over the primary violator's day-to-day operations. *See Ahders*, 982 F.3d at 317 ("We need not decide whether the investors must establish that [the alleged control person] had control over [the primary violator's] day-to-day operations because the investors fail to demonstrate a genuine dispute of material fact that [the alleged control person] directly or indirectly controlled . . . [the] primary violations."); *Heck*, 775 F.3d at 283 n.18 ("This Circuit has not yet decided whether a plaintiff must show that the alleged controlling person had 'effective day-to-day control' or actually exercised his power over the controlled person.") (quoting *Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 619-20 (5th Cir. 1993)).