# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

December 23, 2014

Lyle W. Cayce
Clerk

No. 14-30146

RAYMOND E. HECK; DOUG HAMLEY; CHARLES MOORE; JOSEPH
MCKEARN; ALLEN RICHARDSON,

> Plaintiffs - Appellees

v.

WAYNE TRICHE,

> Defendant - Appellant

Appeal from the United States District Court
for the Middle District of Louisiana

Before HIGGINBOTHAM, CLEMENT, and HIGGINSON, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Following a jury trial, the district court entered judgment imposing liability on Defendant-Appellant Wayne Triche for violations of the Louisiana Securities Law, La. Rev. Stat. Ann. § 51.701 *et seq*. Triche appealed the judgment to this court and, for the reasons to be explained, we AFFIRM.

## FACTS AND PROCEEDINGS

### I. Evidence Adduced at Trial

The facts developed at trial, consistent with the jury's verdict, are as follows. Defendant Ken Buhler was an auctioneer specializing in antique furniture. Buhler met co-defendant Triche, a certified public accountant, in

No. 14-30146

1990, and shortly thereafter hired Triche's then accounting firm, Triche and Associates. In the late 1990s, with the help of Triche and Associates, Buhler launched "Go Antiques," an internet antique furniture business. Triche and Associates helped Buhler draft prospectuses for Go Antiques, raising approximately eight and a half million dollars.

Buhler was fired from his dual roles as president and CEO of Go Antiques on December 20, 2002. Prior to his termination, Buhler took out a number of loans in connection with Go Antiques that left him personally indebted to First Bank for just over one million dollars. Buhler also had a number of outstanding claims and judgments against him totaling over half a million dollars. Triche was aware of these debts. Buhler considered Triche his "business advisor" and close friend and went to Triche for advice after his termination from Go Antiques. Triche advised him to get back into the auction business.

Buhler set out to form a new antique company in the fall of 2003, which ultimately took the name of Antique Investment Group, LLC ("AIG"). With the help of Triche and a partner in Triche's consulting firm, Daryl DeArmond, Buhler created a prospectus (or "AIG pool document") to raise money for AIG from private investors. The AIG pool document explained that "[t]he investors will make loans to [AIG], the proceeds of which will be used to buy inventory pool items." The inventory would then be sold through auctions, showrooms and warehouses, and over the internet. Investors were entitled to a percentage of AIG's "gross profits,"[1] determined by the amount of money they advanced to AIG. The AIG pool document assured investors that "[a]ll investments are secured by inventory purchased on the behalf of AIG," and that "[t]he inventory

---

[1] Gross profits were defined "as the actual cost of goods plus a five (5) percent shipping and handling fee . . . the total of which is then subtracted from the actual selling price less any sales commissions."

pool will fully collateralize the loans." Triche did not draft any of the prospectus himself, but contributed to portions of the document related to payout structure, loan terms and conditions, and securitization.

Buhler used the AIG pool document to solicit investments from Raymond Heck, Doug Hamley, Charles Moore, Joseph McKearn, and Allen Richardson (collectively "plaintiffs"). Between September 12, 2003, and May 5, 2004, plaintiffs advanced Buhler $324,949.00. Buhler reported to Triche each time he obtained money from an investor. Triche, however, did not have direct contact with any of the investors except for Heck. Buhler told Heck that Triche's firm would provide accounting services for AIG, and when Heck called Triche to inquire about the company's legitimacy, Triche assured him it was the "real deal."

During the time Buhler was soliciting investments for AIG, Buhler and Triche had multiple meetings with representatives of First Bank to address his debt obligations. On November 25, 2003, Buhler and Triche had a meeting with Andy Adler, Buhler's loan officer, and Rick Holland, the president of First Bank. Triche was a shareholder in First Bank and had a personal relationship with Adler and Holland. During this meeting, or around this time period, First Bank asked Buhler for "more collateral" for his outstanding loans because his "debt to inventory ratio . . . [was] upside down." The only assets he had to pledge were the inventory of AIG, which had been purchased with plaintiffs' funds. On December 17, 2003, Buhler and Triche again met with representatives of First Bank regarding his debt and borrowing capacity. An invoice from Triche and Associates billed for Triche's time as "meeting with client and bankers regarding loan package and restructure of present debt." The bank demanded additional security from Buhler and, consequently, Buhler "ended up having to pledge assets belonging to [AIG] to the bank in order to get [his] loans restructured."

No. 14-30146

Triche instructed Buhler to pledge AIG's inventory to First Bank. Triche knew that the AIG pool document promised that the investors' loans would be secured by this inventory, and had specifically discussed this fact at the December 17, 2003 meeting with First Bank. On May 3, 2004, Buhler wrote a letter to First Bank, addressed to Andy Adler, titled "Re: In Reference to Loan Restructuring Proposal." In this letter, Buhler agreed to pledge AIG's inventory to "secure" his existing debt and open up a line of credit for AIG. Buhler wrote that he had "spent a significant amount of time" meeting with Triche "to come up with the best possible financial structure of [Buhler's] indebtedness with First Bank and the integration of that relationship with [his] new investor groups." Buhler proposed that the "balance of [his] current inventory loan would be converted to a working line of credit at a favorable interest rate for [him] personally and secured by first position in 100% of all inventory (including all inventory purchased with investor funds)." Buhler continued that pledging his AIG inventory would "secure this portion of the converted debt making your loan to value ratio favorable."

On August 20, 2004, Buhler, on behalf of AIG, executed a promissory note with First Bank in the amount of $350,000 evidencing a line of credit advanced by First Bank to Buhler and AIG. On that same day, Buhler signed a "Commercial Security Agreement," which offered as collateral "all inventory, accounts, equipment, general intangibles and fixtures" of AIG. A few days before August 20, 2004, Triche went to Buhler's office to assist him in putting together the AIG inventory to present to First Bank. Buhler's then accountant, Charlotte Glaspie, asked Triche whether it was legal to pledge the AIG inventory twice. Triche responded that the inventory did not belong to the investors, and that all Buhler owed them was a return on their investment. Buhler told Glaspie that if "Wayne [Triche] said it was okay[,] I guess it's okay."

4

No. 14-30146

Buhler subsequently defaulted on his line of credit from First Bank. On July 13, 2005, First Bank's successor, State Bank & Trust, foreclosed on Buhler's AIG inventory. Plaintiffs sued Buhler and Triche[2] for violations of state and federal securities laws, La. Rev. Stat. Ann. § 51:712 and §10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder. Plaintiffs alleged that the omission of Buhler's dire financial condition and lack of notice that Buhler could pledge the collateral promised to investors to First Bank constituted fraud.[3] In exchange for plaintiffs' agreement not to pursue any judgment against him, Buhler—although nominally a defendant—cooperated with plaintiffs.

## II. Jury Instructions and Verdict

The district court denied Triche's motions for judgment as a matter of law after plaintiffs rested and at the close of evidence. Over plaintiffs' objections, the district court refused to instruct the jury on the Louisiana Securities Law, La. Rev. Stat. Ann. § 51:712. The court agreed with Triche's counsel that the elements of the state claim were identical to those under federal law, and concluded that the state law claim was "assumed" in plaintiffs' claim under Rule 10b-5.

The verdict form—in "yes or no" format—asked the jury whether each of the five elements of a Rule 10b-5 claim were met for each plaintiff as to both Buhler and Triche. The first element asked whether the individual defendant "used an 'instrumentality of interstate commerce' in connection with the advance of funds . . . to [AIG]" for at least one of the plaintiffs. The verdict slip then instructed the jury to consider each of the remaining four elements

---

[2] Plaintiffs brought the same claims against a third defendant, Daryl DeArmond, a partner in Triche's consulting firm. The district court granted DeArmond's motion for judgment as a matter of law at the close of evidence and dismissed all claims against him.

[3] Plaintiffs' additional claims for negligent misrepresentation, conversion, and breach of contract were dismissed prior to trial.

5

sequentially for each plaintiff, continuing on to the next element only if it answered "yes" to the previous one. If all elements were satisfied, the jury had the option to award damages to that plaintiff.

In determining Buhler's liability, the jury answered in the affirmative for every element as to every plaintiff. With regard to Triche, however, the jury answered "yes" to the interstate commerce element for Heck only, and answered "no" as to the other plaintiffs. Because the verdict form instructed that the interstate commerce element needed only be satisfied in connection with one plaintiff, the jury then moved on to consider the remaining four elements sequentially for each plaintiff and answered "yes" as to all. The jury awarded damages for all plaintiffs against Buhler and Triche totaling $301,949.00. The jury apportioned 60% of the liability to Buhler and 40% to Triche.

When the verdict was returned, the district court informed the parties that "the jury did not follow the instructions" because it had awarded damages for each plaintiff against Triche even though it did not find that he used an instrumentality of interstate commerce in connection with four of the plaintiffs. The court announced that it planned to disregard the damage award against Triche for all plaintiffs except Heck. Plaintiffs objected on the ground that liability could be imposed on both defendants so long as one of the defendants was found to have used an instrumentality of commerce. The district court stated that it would withhold its ruling until briefing by the parties.

Plaintiffs subsequently submitted a "Motion to Enter Judgment in Accordance with Verdict Form" and argued that the verdict should be upheld because the jury found that Buhler used an instrumentality of interstate commerce as to all defendants, or, in the alternative, because their securities claim under Louisiana law did not require that an instrumentality of interstate

commerce be used at all. Without explanation, the district court entered judgment on June 22, 2011, in the amounts recorded on the verdict form.

## III. Postjudgment Motions and Rulings

Plaintiffs first moved for attorney's fees on June 21, 2011, one day before the district court entered judgment. The district court dismissed plaintiffs' motion for attorney's fees with instructions to refile after it ruled on postjudgment motions.

On June 29, 2011, plaintiffs moved to amend the judgment pursuant to Federal Rule of Civil Procedure (or "Rule") 59(e) to include prejudgment interest and provide for joint and several liability among Triche and Buhler. On July 20, 2011, Triche timely filed his renewed motion for judgment as a matter of law under Rule 50(b) as to plaintiffs' claims under Rule 10b-5 and the Louisiana Securities Law.[4] On August 19, 2011, Triche filed a motion to amend the judgment and for a new trial based on the district court's statement upon reading the verdict that the jury had not found the required elements to hold Triche liable to four of the plaintiffs.[5]

The district court denied Triche's motions for judgment as a matter of law and for a new trial on September 28, 2012. In its ruling, the district court stated that "the verdict form sets forth all necessary elements for a finding of liability against [Triche]" and explained that its initial comment that the jury

---

[4] Triche's Rule 50(b) motion stated that "Plaintiffs' state Blue Sky Law claims are considered subsumed within the federal law claims for purposes of this motion." Triche's contention on appeal that he did not have the opportunity to contest his liability under Louisiana law in front of the district court is therefore disingenuous. His Rule 50(b) motion clearly sought to dispose of both the state and federal claims at issue during the trial. His failure to adequately brief the district court on the Louisiana Securities Law was a consequence of his own misunderstanding of the elements of a claim under that statute.

[5] The district court purportedly granted Triche an extension of time beyond the twenty-eight day deadline to file his Rule 59 motion, but that deadline is jurisdictional and cannot be extended by the court. *See* Fed. R. Civ. P. 6(b)(2); *Gribble v. Harris*, 625 F.2d 1173, 1174 (5th Cir. 1980).

did not find the requisite elements to impose liability was "in error as there were sufficient elements to hold [Triche] liable under *state* law, not federal law." (emphasis in original). The court further elucidated that "[t]his is because the missing element concerned activity in interstate commerce, which is not required for a finding of liability under state law."

On September 30, 2012, plaintiffs filed their second motion for attorney's fees. On July 2, 2013, in a document titled "Ruling and Order," the district court granted plaintiffs' Rule 59(e) motion with respect to prejudgment interest, but denied the motion's request to declare Triche and Buhler jointly and severally liable. The court again stated that "only the elements for liability under state law were found by the jury," and concluded that defendants could not be held jointly and severally liable under Louisiana law. The court ordered plaintiffs "to file a motion and proposed order within 14 days of this Ruling specifying the amounts owed by each defendant to each plaintiff, including interest."

The July 2, 2013 Order also denied plaintiffs' second motion for attorney's fees for failure to submit time sheets in compliance with Local Rule 54.2, but invited them to refile the motion in accordance with the rule. On July 12, 2013, Triche moved to toll the appeal deadline until the court ruled on plaintiffs' refiled motion for attorney's fees pursuant to Rule 58 and Federal Rule of Appellate Procedure (or "FRAP") 4(a)(4)(A)(iii). The district court granted the motion the same day and stayed the running of the appeals deadline until the court ruled on any refiled motion in an "Amended Final Judgment."

On August 5, 2013, plaintiffs filed a "Motion for Reconsideration." In this motion, plaintiffs renewed their request for attorney's fees, argued that the district court erred in denying their Rule 59(e) motion for joint and several liability, and provided a proposed judgment for each plaintiff that included the

damages assessed against Triche in the jury verdict "plus legal interest from [the date the promissory note was issued] until paid." On February 4, 2014, the district court issued a "Ruling, Order and Judgment." The district court denied plaintiffs' fee motion for again failing to comply with Local Rule 54.2 and denied plaintiffs' request for reconsideration—treating it as a motion under Rule 60(b)—of the court's refusal to impose joint and several liability. The ruling also included judgments for each of the plaintiffs against Buhler and Triche. The judgments, for the first time, specified that that prejudgment interest would be paid at the statutorily-prescribed state rate from the date of the issuance of the promissory note until June 22, 2011—the date of the initial judgment—and thereafter at the federal postjudgment rate, "until paid."

Triche filed a notice of appeal on February 14, 2014. On appeal, Triche argues that the district court erred by denying his motions for judgment as a matter of law and giving incomplete jury instructions. Triche also claims that there was insufficient evidence for the jury to find him liable under the state or federal securities laws. Plaintiffs moved to dismiss Triche's appeal as untimely and argue that the jury's verdict on the federal claim should be reinstated.

## STANDARD OF REVIEW

"We review de novo the district court's denial of a motion for judgment as a matter of law, applying the same standard as the district court." *Foradori v. Harris*, 523 F.3d 477, 485 (5th Cir. 2008) (internal quotation marks omitted). A motion for judgment as a matter of law in a case tried by a jury, however, "is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995). "Although our review is de novo, we recognize that our standard of review with respect to a jury verdict is especially deferential." *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 235 (5th Cir. 2001) (internal quotation marks omitted). "In

resolving such challenges, we draw all reasonable inferences and resolve all credibility determinations in the light most favorable to the nonmoving party," and will reverse the denial of a motion or renewed motion for judgment as a matter of law "only if the evidence points so strongly and so overwhelmingly in favor of the nonmoving party that no reasonable jury could return a contrary verdict." *Foradori*, 523 F.3d at 485 & n.8. "A jury verdict must be upheld unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Id.* at 485 (internal quotation marks omitted).

## DISCUSSION

### I. Motion to Dismiss

Plaintiffs first move to dismiss Triche's appeal for lack of jurisdiction on the grounds that it was untimely. *See Freudensprung v. Offshore Technical Servs., Inc.*, 379 F.3d 327, 334 (5th Cir. 2004) ("A timely filed notice of appeal is a jurisdictional prerequisite to appellate review." (alteration omitted)). The district court entered its initial judgment on June 22, 2011. In civil cases between private parties, the litigants have thirty days from the entry of judgment to file a notice of appeal unless certain postjudgment motions are filed before that time period has lapsed. *See* FRAP 4(a)(1)(A), (4)(A). As relevant here, timely filed postjudgment motions under Rules 50(b) and 59 will toll the thirty-day period for filing a notice of appeal until the last such remaining motion is decided. FRAP 4(a)(4)(A)(i) & (iv)–(v). A motion for attorney's fees under Rule 54 will also extend the time to appeal if, before a notice of appeal has been filed, the court orders that the motion will have the same tolling effect as one under Rule 59. FRAP 4(a)(4)(A)(iii); Rule 58(e).

Triche's February 14, 2014 appeal was timely if (1) any of plaintiffs' motions for attorney's fees tolled the time period for appeal until that date or (2) the district court's February 4, 2014 Order finally disposed of plaintiffs' Rule 59 motion for prejudgment interest.

No. 14-30146

Plaintiffs argue that the district court's disposition of their Rule 59(e) motion on July 2, 2013 disposed of the final postjudgment motion capable of tolling the appeal deadline and therefore started the thirty-day clock. Plaintiffs reason that the only extant issues after the July 2, 2013 Order were a ministerial calculation of legal interest and a decision on attorney's fees, which they contend do not affect the finality of a judgment.

## A. Attorney's Fees

Relying on *Budinich v. Becton Dickinson and Co.*, 486 U.S. 196, 199–203 (1988), plaintiffs argue that an outstanding issue of attorney's fees does not prevent a judgment from becoming final. Triche responds that the district court's order tolling the appeal deadline until it disposed of plaintiffs' motion for attorney's fees prevented the deadline from running until the court denied the motion on February 4, 2014.

Plaintiffs correctly state the holding of *Budinich*, but misunderstand its import here. In 1993, Congress amended FRAP 4(a)(4) to conform to *Budinich*. *See* FRAP 4, Advisory Committee Notes, 1993 Amendments. The Rule now provides that a timely filed motion for attorney's fees under Rule 54 will delay the time for an appeal "*if* the district court extends the time to appeal under Rule 58." FRAP 4(a)(4)(A)(iii) (emphasis added). Congress "exclude[d] motions for attorney's fees from the class of motions that extend the filing time unless a district court, acting under Rule 58, enters an order extending the time for appeal." FRAP 4, Advisory Committee Notes, 1993 Amendments; *see also Ray Haluch Gravel Co. v. Cent. Pension Fund of Int'l Union of Operating Eng'rs & Participating Emps.*, 134 S. Ct. 773, 781 (2014) (explaining that Rule 58(e) "confirms the general practice of treating fees and costs as collateral for finality purposes" in accordance with *Budinich*, but permits a district court to delay the time to appeal "to avoid a piecemeal approach in the ordinary run of cases where circumstances warrant delaying the time to appeal"). The dispositive

question, then, is whether the district court's July 12, 2013 Order tolling the appeals deadline was valid under Rule 58, and thus extended the time for appeal under FRAP 4(a)(4)(A)(iii).

Rule 58(e) provides that "if a timely motion for attorney's fees is made under Rule 54(d)(2), the court may act before a notice of appeal has been filed and become effective to order that the motion have the same effect under [FRAP] 4(a)(4) as a timely motion under Rule 59." The first issue is whether plaintiffs' fee motion was timely.[6] After the court dismissed plaintiffs' first motion for attorney's fees with an order to refile the motion after the court ruled on postjudgment motions, plaintiffs filed a second fee motion on September 30, 2012. On July 2, 2013, the district court denied this motion without prejudice and ordered plaintiffs to refile the motion within 14 days in compliance with the Local Rules. Plaintiffs requested an extension of time to file their third fee motion on July 12, 2013 and were granted a new deadline of August 5, 2013. Plaintiffs filed their third fee motion on August 5, 2013. The court denied the motion (again, without prejudice) on February 4, 2014.

Rule 54(d)(2)(B)(i) provides, in relevant part, that "[u]nless a statute or a *court order* provides otherwise, the motion [for attorney's fees] must . . . be filed no later than 14 days after the entry of judgment." (emphasis added).[7]

---

[6] Plaintiffs argue that the district court's order did not toll the time for appeal because *Triche*'s Rule 58(e) motion was untimely as measured from plaintiffs' initial motion for attorney's fees and the initial entry of judgment. This argument is premised on a misreading of Rule 58(e). Rule 58(e) permits tolling if a "timely *motion for attorney's fees* is made under Rule 54(d)(2)." (emphasis added). Rule 58 does not set out a timeliness requirement for the tolling motion—it is the fee motion that must be timely. The rule requires only that the district court's tolling order—and therefore any motion for such order—treating the fee motion as a Rule 59 motion be entered "before a notice of appeal has been filed and become effective." Plaintiffs' contention that Triche was required to file a tolling motion under Rule 58(e) within twenty-eight days of the judgment is meritless. Indeed, the operative fee motion here, as discussed *infra*, was not filed until more than two years after the initial judgment.

[7] Local Rule 54.2 governing the award of attorney's fees does not substitute a filing deadline for the fourteen day period listed in the federal rules.

No. 14-30146

Plaintiffs complied with each of the district court's orders for filing their attorney fee motions. Accordingly, under Rule 54(d)(2)(B), all of plaintiffs' fee motions made before Triche noticed his appeal were timely.[8] But Rule 58(e) specifies that if a timely fee motion is made, the district court may "order that *the* motion" have the same effect as a Rule 59 motion. (emphasis added). Triche requested in his Rule 58(e) motion that the district court treat plaintiffs' prospective third fee motion as one under Rule 59. Granting Triche's motion, the district court entered its Rule 58(e) Order on July 12, 2013, "stay[ing] the running of appeal deadlines until the Court issues an Amended Final Judgment" including an award (or not) of attorney's fees and prejudgment interest. Plaintiffs' first two fee motions—filed on June 21, 2011 and September 30, 2012—were already dismissed by the time the court entered its order, and thus could not have tolled the appeals deadline until February 14, 2014. Plaintiffs' August 5, 2013 fee motion, however, was not denied until February 4, 2014. Thus, if the district court had the authority to issue its Rule 58(e) Order treating the yet-to-be-filed August 5, 2013 fee motion as one under Rule 59, the court's Order reset the time to file an appeal when the motion was disposed of on February 4, 2014, and Triche's notice of appeal was timely.

There is nothing in the text of Rule 58(e) that prevents a district court from ordering that a prospective timely fee motion will toll the deadline for appeal. The rule simply states that "if a timely motion for attorney's fees is made," the court may order that the motion has the same tolling effect as one under Rule 59, provided that the order is entered "before a notice of appeal has been filed and become effective." The only temporal limitation on the court's

---

[8] The 1993 Advisory Committee Notes to the Rule also state that "the granting of a motion under Rule 59" automatically begins a new period for filing. So, even if plaintiffs' first two requests had not been timely, their August 5, 2013 motion would have been timely because the district court partially granted plaintiffs' Rule 59 motion on July 2, 2013 and then extended plaintiffs' time to file another fee motion until August 5.

No. 14-30146

authority to treat a Rule 54 motion for attorney's fees as a motion under Rule 59 is that the order must be issued before a party has filed a notice of appeal and before the time to notice an appeal has expired. *See Bunley v. City of San Antonio*, 470 F.3d 189, 200 (5th Cir. 2006) (holding that even if no appeal is taken, the district court cannot "revive and retroactively delay [a party's] time to appeal from the judgment on the merits after that judgment ha[s] become final and unappealable"). Thus, a district court may order that a motion for attorney's fees has the same tolling effect as a motion filed under Rule 59 even if the order is entered before a fee motion is filed, so long as: the fee motion is timely, no appeal has been noticed, and the time for appeal has not expired.

In dicta, the Second Circuit has endorsed a contrary interpretation. In holding that a Rule 58(e) order can only toll the time for appeal while the possibility of an appeal exists, the Second Circuit—interpreting an iteration of the rule prior to the 2007 amendments[9]—stated that the phrase "'*when* a timely motion for attorneys' fees is *made*,' . . ., indicates that a Rule 58[e] order cannot properly be entered prior to the filing of a fee motion." *Mendes Junior Int'l Co. v. Banco do Brasil, S.A.*, 215 F.3d 306, 312–13 (2d Cir. 2000). But Rule 58 does not, by its text, prohibit a district court from *entering* a tolling order in anticipation of a forthcoming motion for attorney's fees. A better reading of the Rule, especially considering the permissive gloss of the 2007 Amendments,  is that it prevents a tolling order from taking *effect* until, and unless, a timely fee motion pursuant to Rule 54 is filed. This interpretation is

---

[9] Rule 58(c)(2), as amended in 1993, stated that: "When a timely motion for attorney's fees is made under Rule 54(d)(2), the court may act before a notice of appeal has been filed and has become effective to order that the motion have the same effect under [FRAP] 4(a)(4) as a timely motion under Rule 59."  As part of the 2007 Amendments to the Rules, this provision was relocated to Rule 58(e) and "[w]hen a timely motion for attorney's fees is made" was replaced with "[b]ut if a timely motion for attorney's fees is made."  The 2007 amendments are "stylistic only."  Advisory Committee Notes, 2007 Amendments.

faithful both to the amendment's goal of efficiency, and the rule that "[a] district court has inherent power 'to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.'" *United States v. Colomb*, 419 F.3d 292, 299 (5th Cir. 2005) (*quoting Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)).

This conclusion is strengthened when one considers the "intertwined provisions" of FRAP 4(a)(4), Rule 58, and Rule 54. *Mendes Junior*, 215 F.3d at 311. FRAP 4(a)(4)(iii) provides that a *timely* fee motion under Rule 54 will extend the time for appeal if the district court designates that it will have such effect under Rule 58(e). Rule 54, in turn, permits a district court, by court order, to determine the timeliness of a fee motion. It follows that a court, in setting a deadline for the filing of a fee motion consistent with its power under Rule 54, may also order that a complying motion will toll the time for appeal under Rule 58(e). If Rule 58(e) is read to prevent a district court from treating an anticipated fee motion as one under Rule 59, the district court will be forced to file two orders: one permitting an extension of time; and, once the fee motion that was the subject of the court's first order is filed, a separate order declaring that it will toll the time for appeal.[10] Accordingly, both the text and purpose of Rule 58 support finding that a district court may enter a Rule 58(e) motion to take effect upon the filing of a timely fee motion. Because the district court's July 12, 2013 Order granting Triche's request to stay the appeal deadline until plaintiffs' third fee motion was decided had the effect of treating plaintiffs'

---

[10] Moreover, in the not uncommon instance where a district court orders that a fee motion be refiled, the opposing party will have to request, and the court will have to enter, a separate 58(e) order upon each iteration if such an order cannot address a prospective fee motion. It is easy to imagine the confusion this burdensome procedure would create among courts and litigants alike, potentially resulting in a party's forfeiture of the right to appeal the underlying judgment (as is threatened in the instant case).

August 5, 2013 fee motion as a timely motion under Rule 59, Triche's February 14, 2014 appeal was timely.

### B. Prejudgment Interest

Even assuming that the district court's Rule 58(e) Order was ineffective, Triche's appeal would still be timely. Triche argues that the district court's July 2, 2013 Order did not completely dispose of plaintiffs' Rule 59 motion for prejudgment interest, and that this disposition was not accomplished until the court's February 4, 2014 Order and Judgment. Plaintiffs respond that the June 22, 2011 Judgment was a final judgment even though it made no mention of interest because prejudgment and postjudgment interest were both statutorily mandated and thus all that remained was a ministerial calculation.

Plaintiffs' argument ignores the Supreme Court's admonition that "prejudgment interest is an element of [a] plaintiff's complete compensation" and a district court, in deciding whether to award prejudgment interest (and how much), must examine "matters encompassed within the merits of the underlying action." *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175–76 (1989) (alterations omitted). For this reason, the Supreme Court has held that a postjudgment motion for discretionary *or mandatory* prejudgment interest is a Rule 59(e) motion that tolls the time for appeal. *Id.* at 176 & n.3; *see also, Crowe v. Bolduc*, 365 F.3d 86, 92–93 (1st Cir. 2004) (holding that *Osterneck* requires that postjudgment motions "seeking an initial award of mandatory prejudgment interest" must be brought pursuant to Rule 59(e) and citing cases). Thus, contrary to plaintiffs' contention that their motion for prejudgment interest did not require an amendment to the June 22, 2011

No. 14-30146

Judgment, the court's award was a substantive alteration to the judgment and thus had precisely that effect.[11]

The question remains whether the district court's July 2, 2013 Order completely disposed of plaintiffs' Rule 59(e) motion for prejudgment interest seven months before Triche's appeal.  In that Order, the district court announced that it would award prejudgment interest at the Louisiana statutory rate and specified the date from which the interest would run.  This Order could be interpreted to contain the requisite amount of information pertaining to the award of prejudgment interest to constitute a final amended judgment.  *See, e.g.*, *SEC v. Carrillo*, 325 F.3d 1268, 1272 (11th Cir. 2003) (holding that "if the judgment amount, the prejudgment interest rate, and the date from which prejudgment interest accrues have been established . . . the court's failure to calculate the precise amount of prejudgment interest does not prevent the court's order from constituting a final judgment.").

It is apparent, however, that the district court did not intend for its July 2, 2013 Order to be final.  Rule 58(a) requires that "[e]very judgment and amended judgment must be set out in a separate document."[12]  The district court's July 2, 2013 "Ruling and Order" provided that interest "*will be calculated*" from the date of the issuance of the promissory notes and ordered

---

[11] Plaintiffs' citations to cases in which the district court's final judgment awarded prejudgment interest and left nothing more than a calculation to be completed are inapposite. The district court's June 22, 2011 Judgment made no mention of prejudgment interest and therefore required an amendment to include such interest. *See Osterneck*, 489 U.S. at 176 & n.3.

[12] Rule 58(a) also states that a separate document is not required for an order "disposing of" a postjudgment motion that tolls the time for appeal under FRAP 4(a)(4), such as a Rule 59 motion. As the Seventh Circuit has explained, "[t]he only way to reconcile the requirement that an amended judgment be set forth in a separate document with the exception to that requirement for an order disposing of a Rule 59(e) motion is by reading 'disposing of a motion' as 'denying a motion.'" *Emp'rs Ins. of Wasau v. Titan Int'l, Inc.*, 400 F.3d 486, 489 (7th Cir. 2005).  This interpretation is supported by the Advisory Committee Notes, which clarify that "if disposition of the [Rule 59] motion results in an amended judgment, the amended judgment must be set forth on a separate document."

plaintiffs to file a proposed order specifying the amounts owed to each defendant.  Less than two weeks after that Order, the district court granted Triche's motion to stay the appeals deadline until it "issue[d] an Amended Final Judgment."  On February 4, 2014, the court issued a "Ruling, Order and Judgment" that, for the first time, specified that prejudgment interest at the state rate would run until June 22, 2011, and from the federal rate thereafter until paid, and entered judgment for plaintiffs.[13]

It is clear that the district court intended to dispose of plaintiffs' Rule 59(e) motion completely in the February 4, 2014 "Judgment" and not its July 2, 2013 "Order."  Accordingly, the February 4, 2014 document is the final judgment starting the appellate clock.  *See Creaghe v. Albermarle Corp.*, 98 F. App'x 972, 974 (5th Cir. 2004) (finding that where an order "contemplated that a separate final judgment would later issue," and the district court did not intend the order to be a final decision, the order was not a final judgment); *Oliver v. Home Indem. Co.*, 470 F.2d 329, 331 (5th Cir. 1972) (holding that where the district court entered orders responsive to postjudgment motions stating that an "Amended Final Judgment" would be issued, orders were not final and an appeal could not be taken until the amended judgment was issued); *see also Goodwin v. United States*, 67 F.3d 149, 151 (8th Cir. 1995) ("To be a final order or judgment, there must be 'some clear and unequivocal manifestation by the trial court of its belief that the decision made, so far as [the court] is concerned, is the end of the case.'" (quoting *Fiataruolo v. United*

---

[13] In addition to the amended final judgment, the February 4, 2014 "Ruling, Order, and Judgment" also included an opinion denying plaintiffs' motion for reconsideration of the court's refusal to impose joint and several liability and plaintiffs' motion for attorney's fees. As Triche timely appealed from this amended judgment, he had no incentive to argue that it violated the separate document rule and thus did not constitute a final judgment.  Because this requirement is not jurisdictional and neither party has mentioned it, it is waived.  *See Simmons v. Willcox*, 911 F.2d 1077, 1080 (5th Cir. 1990).

*States*, 8 F.3d 930, 937 (2d Cir. 1993)).  Because Triche filed his notice of appeal well within this thirty-day window, plaintiffs' jurisdictional argument also fails for this reason.

Plaintiffs' motion to dismiss Triche's appeal for lack of jurisdiction is DENIED.

## II. Jury Instructions

### A. Federal Law

Triche argues that the district court's judgment must be reversed because the court gave "incomplete" jury instructions under federal law and no instructions at all under state law.  Because of the confusing procedural posture, both parties misunderstand the district court's final judgment and the issues on appeal.  The district court did *not* hold Triche liable under federal law.  As detailed above, after the district court announced its intention to disregard much of the damages award against Triche, plaintiffs argued that the verdict was proper under both the federal and state securities statutes. The district court subsequently entered a judgment against Buhler and Triche consistent with the jury's award of damages, without explanation as to whether Triche's liability rested on Rule 10b-5, the Louisiana Securities Law, or both statutes.  In its orders denying Triche's Rule 50(b) motion and granting-in-part plaintiffs' Rule 59(e) motion, the district court stated that the jury's verdict against Triche satisfied the elements of plaintiffs' state law claim, but not their federal law claim.

Whether this "clarification" is viewed as the court's fixing of a clerical error in its June 22, 2011 judgment—i.e. a "failure to memorialize part of its decision," *Garamendi v. Henin*, 683 F.3d 1069, 1079 (9th Cir. 2012)—or as the court's exercise of its authority to substantively amend its initial judgment in response to the parties' postjudgment motions, the final disposition in district court was that Triche's liability is predicated entirely on La. Rev. Stat. Ann.

§§ 51:712 & 714. *See In re Galiardi*, 745 F.2d 335, 337 (5th Cir. 1984) (Rule 60(a) permits a court, at any time, "to correct omissions in a judgment that had been intended at the time of its entry," but "does not grant a district court carte blanche to supplement by amendment an earlier order by what is subsequently claimed to be an oversight or omission."); *Rivera v. PNS Stores, Inc.*, 647 F.3d 188, 198–99 (5th Cir. 2011) ("[A] change to a judgment that affects the substantive rights of the parties is beyond the scope of Rule 60(a)" and must be corrected by a motion under Rule 59(e) (internal quotation marks and alterations omitted)). Accordingly, Triche's arguments directed towards the court's jury instructions and sufficiency of the evidence related to *federal* law are inapposite. Likewise, as discussed *infra*, plaintiffs' arguments that Triche should be held liable under federal law are not properly before us because they failed to file a cross-appeal.

**B. State Law**

Triche also challenges the district court's failure to instruct the jury on the elements of a claim under La. Rev. Stat. Ann. §§ 51:712(A) & 714(B), and failure to require the jury to make a factual finding as to whether or not Triche was a "seller" or "control person" under the Louisiana Securities Law. Triche, however, has forfeited his right to raise these claims here. Under the invited error doctrine, "[a] party cannot complain on appeal of errors which he himself induced the district court to commit." *United States v. Lopez-Escobar*, 920 F.2d 1241, 1246 (5th Cir. 1991). "This Court has made clear that the invited error doctrine applies to jury instructions as well as evidentiary rulings." *United States v. Baytank (Houston), Inc.*, 934 F.2d 599, 606–07 (5th Cir. 1991).

The district court refused to instruct the jury on plaintiffs' state law claim because it concluded that the elements of the claim were identical to a claim under Rule 10b-5. This determination was clearly erroneous. To establish a claim under Rule 10b-5, a plaintiff must prove "1) a misstatement

or omission 2) of material fact 3) occurring in connection with the purchase or sale of a security, that 4) was made with scienter and 5) upon which the plaintiff justifiably relied, 6) and that proximately caused injury to the plaintiff." *Brunig v. Clark*, 560 F.3d 292, 295–96 (5th Cir. 2009) (internal quotation marks omitted). Section 712 of the Louisiana Securities Law, La. Rev. Stat. Ann. § 51:712, is *not* based on Section 10(b) of the Securities and Exchange Act of 1934, but is "[m]odeled after Section 12(2) of the Securities Act of 1933." *State v. Powdrill*, 95-2307 (La. 11/25/96), 684 So. 2d 350, 354. The Louisiana statute provides:

> A. It shall be unlawful for any person:
>
> . . .
>
> (2) To offer to sell or to sell a security by means of any oral or written untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, if such person in the exercise of reasonable care could not have known of the untruth or omission.

La. Rev. Stat. Ann. §  51:712.

It must first be noted that the statute contains a scrivener's error that inverts its purpose. As currently written the statute imposes liability on "any person" who makes a material misstatement or omission "if such person in the exercise of reasonable care could *not* have known of the untruth or omission." That is, the statute penalizes a seller that did not know, and, acting with reasonable care, still could *not* have known, of the falsity of the statement or the misleading nature of the omission.

The origin of this mistake is clear. Unlike Section 12(2) of the Securities Act of 1933, the Louisiana Securities Law was also intended to serve as a criminal statute. The previous version of the statute was identical to the current version except for the last clause. That iteration made it "unlawful for

any person" to make a material misstatement or omission "if such person *shall not sustain the burden of proof that he did not know, and* in the exercise of reasonable care could not have known, of the untruth or omission." In *State v. Powdrill*, the Louisiana Supreme Court held that the predecessor of the current version of Section 712(A)(2) was unconstitutional as applied in criminal cases because "it impermissibly shift[ed] the burden of proof of an essential element of the crime to defendants." 684 So. 2d at 356. Responding to *Powdrill*, the Louisiana legislature deleted the burden shifting language emphasized above. *See* 1999 La. Bill Digest, Engrossed, 1999 Reg. Sess. H.B. 445. This deletion turned what was previously conduct that allowed a defendant to *avoid* liability—i.e. exercising reasonable care—into an element of the offense. It is evident that the legislature simply intended to remove the burden of proof of demonstrating the exercise of reasonable care from the defendant and require the plaintiff, or state in a criminal proceeding, to prove the defendant's knowledge or negligence.[14] Indeed, it appears that Louisiana courts have implicitly assumed the statute to impose the intended negligence standard. *See, e.g.*, *George v. White*, 12-101 (La. App. 5 Cir. 10/30/12), 101 So. 3d 1036, 1045–46 (concluding that defendant was not liable under Section 712 because plaintiff offered no evidence that defendant "knew or 'in the exercise of reasonable care' could have known" that the statements were false).

La. Rev. Stat. Ann. § 51:712(A)(2) thus requires the plaintiff to show that:

> (1) the defendant made a false or misleading statement of a material fact or failed to state a material fact necessary in order to make the statement not misleading; (2) the plaintiff did not know of the untruth or omission; (3) the defendant knew, or in the

---

[14] A criminal conviction under the Louisiana Securities Law requires the state to prove that the defendant acted willfully. La. Rev. Stat. Ann. § 51:723; *Powdrill*, 684 So. 2d at 355. It is unclear whether the current statute would pass constitutional muster as a criminal law.

No. 14-30146

exercise of reasonable diligence, could have known, of the untruth or omission.

*Ponthier v. Manalla*, 06-632 (La. App. 5 Cir. 1/30/07); 951 So. 2d 1242, 1255 (*quoting Taylor v. First Jersey Securities, Inc.*, 533 So. 2d 1383, 1386 (La. App. 4 Cir. 1988)).[15]

There are obvious differences between the elements required to establish liability under Rule 10b-5 and Louisiana's Section 712. As the district court acknowledged in recognizing the error in its verdict form, Section 712 does not require a connection to interstate commerce. Next, Section 712 does not require a plaintiff to establish scienter, but, like Section 12(2) of the Securities Act of 1933, requires only a showing that the defendant was negligent. *See Landry v. Thibaut*, 523 So. 2d 1370, 1380 (La. Ct. App. 5 Cir. 1988); *Dupuy v. Dupuy*, 551 F.2d 1005, 1023 n.31 (5th Cir. 1977) (Section 712 "measures the conduct of defendants against a negligence standard of care."). Also like its federal analog Section 12(2), Section 712 does not require a plaintiff to prove that he relied on the defendant's misrepresentation or omission. *Cf. Junker v. Crory*, 650 F.2d 1349, 1359 (5th Cir. 1981) (holding that to recover under Section 12(2) "plaintiff need not establish that the defendant acted with scienter or that he relied in any way on the defendant's misrepresentations or omissions."). But, in contrast to Rule 10b-5's less restrictive "in connection with" requirement, Section 712 specifies that it is "the defendant" himself that must have made the misstatement or omission. *See Powdrill*, 684 So. 2d at

---

[15] One Louisiana appellate court has held that loss causation is an element of a claim under Section 712. *See Williams v. Edward D. Jones & Co.*, 556 So. 2d 914, 917 (La. Ct. App. 3 Cir. 1990). Subsequent recitations of the rule have not included this element and, as this court recently noted, the state of the law on this issue is uncertain. *See Fishman v. Morgan Keegan & Co.,* 574 Fed. App'x 449, 454 (5th Cir. 2014) ("[T]he question whether the Louisiana Securities Law requires proof of loss causation does not have a straightforward answer."). Because Triche makes no argument related to loss causation and, in any case, is precluded from raising his state law jury instruction claim, we need not take up the question here.

354 ("Analogous to the Securities Act of 1933, [Section] 712(A)(2) also creates the liability of sellers of securities who make material misstatements or omissions in prospectuses."); *Dupuy*, 551 F.2d at 1023 n.31 (Section 712 "prohibits only misrepresentations by sellers"); *cf. Cyrak v. Lemon*, 919 F.2d 320, 324 (5th Cir. 1990) ("[T]he Section 12(2) definition of seller does not apply to either Section 10(b) or Rule 10b–5.").

Thus, the district court erred in requiring the jury to find the elements of a Rule 10b-5 claim to impose liability under Section 712 of the Louisiana Securities Law. But this error was committed at Triche's insistence. In his proposed jury instructions, Triche represented that the provisions of the Louisiana Securities Law are analogous to Rule 10b-5, and thus that his suggested federal jury charges also covered plaintiffs' claims under Section 712. At the charging conference, it was *plaintiffs*' counsel that requested a separate instruction for the state claim. In fact, plaintiffs' counsel specifically requested an instruction on Louisiana's control person statute—the omission of which Triche now alleges prejudiced him. Triche's counsel, on the other hand, not only failed to object to the omission of a state law instruction, but encouraged the district court to reject plaintiffs' proposed instruction and erroneously argued that Louisiana law is "replete" with jurisprudence that the state statute contains the same elements as a claim under Rule 10b-5. Because Triche invited the error he now complains of, he is foreclosed from seeking relief from this court. *See United States v. Gray*, 626 F.2d 494, 501 n.2 (5th Cir. 1980) ("The invited error doctrine bars reversal even if the instruction constituted plain error.").[16]

---

[16] Triche makes a corollary argument that the jury's answers were inconsistent with each other and the verdict, and that the district court erred by not requiring the jury to reconsider its verdict under Rule 49. As an initial matter, this claim relates only to plaintiffs' Rule 10b-5 claim, which is not properly at issue on appeal. As discussed, Triche cannot raise any argument related to the court's error in state law instruction. But Triche's argument

No. 14-30146

## III. Sufficiency of the Evidence

Triche next argues that there was insufficient evidence from which a properly instructed jury could find that he was a "seller" of the AIG securities or a "control person" of AIG under Louisiana law. Because these questions were not submitted to the jury and the district court did not make a factual finding on the issues, the court "is considered to have made a finding consistent with its judgment on the special verdict." Fed. R. Civ. P. 49(a)(3). The district court's final judgment imposed liability on Triche for violations of the Louisiana Securities Law and the court is thus deemed to have made the required finding that Triche was either a seller or control person of a seller under the statute. *See id.* The court's imputed factual findings under Rule 49 are reviewed for clear error. *See Taherzadeh v. Clements*, 781 F.2d 1093, 1100 (5th Cir. 1986); *J.C. Motor Lines, Inc. v. Trailways Bus Sys., Inc.,* 689 F.2d 599, 602 (5th Cir. 1982).

Section 712(A) makes it unlawful for a *seller* to make a material misstatement or omission in a prospectus. *See Powdrill*, 684 So. 2d at 353; *Dupuy*, 551 F.2d at 1024. Section 714(A) imposes liability on "[a]ny person who violates [Section] 712(A)." La. Rev. Stat. Ann. § 51:714(A). Because there is a dearth of law interpreting the definition of a seller under the state statute, we look to federal law interpreting the Louisiana law's model, Section 12(2) of

---

also fails as a factual matter. His contention is predicated on the jury's answers to the interstate commerce question. The jury answered "no" as to four of the five plaintiffs on the question of whether Triche used an instrumentality of interstate commerce in connection with the advance of funds to AIG, but proceeded to find that the other elements of the Rule 10b-5 claim were satisfied as to each plaintiff and awarded damages for all plaintiffs. The jury's answers were not inconsistent. The jury instructions required that plaintiffs must show "that *one or both* of the defendants used an instrumentality of interstate commerce in connection with the securities transaction involved in this case." Likewise, the verdict form directed that the jury should stop at the first element (instrumentality of interstate commerce) only if it answered "no" for *every* plaintiff on the interstate commerce question. Although the district court believed that the jury did not follow the instructions, it was the court that misread the verdict form, not the jury.

the Securities Act of 1933. *Powdrill*, 684 So. 2d at 353. Section 12(2) requires a two-step inquiry to determine if a defendant is a "seller" within the meaning of the statute: "(1) who passed title to the purchaser or solicited the title-passing transaction; and (2) from whom did the plaintiff buy the security?" *Ins. Co. of N. Am. v. Dealy*, 911 F.2d 1096, 1101 (5th Cir. 1990) (applying the rule articulated in *Pinter v. Dahl*, 486 U.S. 622 (1988), for determining who is a seller under Section 12(1) of the Securities Act of 1933 to the same inquiry under Section 12(2)).

It is clear that Triche was not a "seller" of the AIG securities under Section 712. Triche did not solicit any of the plaintiffs, nor did any of the plaintiffs purchase AIG securities from him. On the other hand, it is equally clear that Buhler was a "seller" of the AIG securities under Section 712 (Triche does not argue to the contrary) and, as such, is liable to plaintiffs under Section 714(A).

> Section 714(B) of the Louisiana Securities Law provides that:
>
> *Every person who directly or indirectly controls a person liable under Subsection [714]A of this Section*, every general partner, executive officer, or director of such person liable under Subsection A of this Section, every person occupying a similar status or performing similar functions, and every dealer or salesman who participates in any material way in the sale *is liable jointly and severally with and to the same extent as the person liable under Subsection A of this Section unless the person whose liability arises under this Subsection sustains the burden of proof that he did not know and in the exercise of reasonable care could not have known of the existence of the facts by reason of which liability is alleged to exist.* There is contribution as in the case of contract among several persons so liable.

La. Rev. Stat. Ann. § 51:714(B) (emphases added). Thus, Triche is liable for Buhler's primary violations of Section 712 if he "directly or indirectly control[led]" him, unless Triche "sustains the burden of proof that he did not know and in the exercise of reasonable care could not have known" of the

material omissions in the AIG pool document giving rise to Buhler's liability.[17] Control is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person." La. Rev. Stat. Ann. § 51:702(4). Here again, Louisiana precedent is thin on when a defendant "controls" a primary violator of Section 712, and we look to federal law for instruction.

In determining who is a "control person," the Fifth Circuit similarly construes the control person provisions in Section 15 of the Securities Act of 1933, 15 U.S.C. § 77o, and Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). *See e.g.*, *Paul F. Newton & Co. v. Tex. Commerce Bank*, 630 F.2d 1111, 1115 (5th Cir. 1980). Control person liability does not require participation in the fraudulent transaction. *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 958 (5th Cir. 1981). But a plaintiff "must at least show that the defendant had an ability to control the specific transaction or activity upon which the primary violation is based." *Meek v. Howard, Weil, Labouisse, Friedrichs, Inc.*, 95 F.3d 45, 1996 WL 405436, at *3 (5th Cir. June 25, 1996) (unpublished decision) (citing *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619–20 (5th Cir. 1993)).[18]

The alleged fraudulent conduct is the omission of Buhler's financial condition and a proviso from the prospectus explaining that, despite the prospectus's statement that plaintiffs' loans would be secured by the AIG inventory purchased with the money, Buhler could pledge the promised

---

[17] The Louisiana legislature has evidently elected to leave the burden-shifting language in place for control person liability under Section 714(B), but not primary liability under Sections 712 and 714(A).

[18] This Circuit has not yet decided whether a plaintiff must show that the alleged controlling person had "effective day-to-day control" or actually exercised his power over the controlled person. *Abbott*, 2 F.3d at 619–20. Even assuming these elements are required, the district court's findings would not be clear error for the reasons discussed *infra*.

collateral to another entity with a priority lien.  Buhler's testimony evinced that he was completely dependent on Triche after he was fired from Go Antiques.  Buhler went to Triche for guidance after his termination and Triche advised Buhler to get back into the antique business, precipitating the formation of AIG.  Triche contributed to the AIG pool document, including the portion that stated that the investors' loans would be collateralized with AIG inventory.  Triche was the "financial guy," and approved the language in the prospectus.  Charlotte Glaspie, Buhler's former secretary (whom Buhler fired and had not spoken to until questioning her at trial), testified that upon completing the AIG pool document, Triche remarked that it was "a good document" and said "we're going to raise some money and we're going to get Ken and them back flush."  Heck testified that he called Triche to determine if he should invest in AIG and Triche told him it was the "real deal."

AIG was created as an entity to pool investor funds, and during the time Buhler was soliciting investments, AIG's main purpose was capital acquisition. Buhler testified that he reported to Triche "every single time" he obtained money from an investor.  Buhler also testified that he would not do anything substantial without Triche's "blessing."  He would consult with Triche about all decisions except for "day-to-day small things in the operation."

During the time Buhler was soliciting investments, Triche and Buhler met with Buhler's loan officer and the president of First Bank to discuss the "restructuring of his debt."  Buhler owed over a million dollars to First Bank, and although his debt apparently was not yet delinquent, he had no plan other than AIG to come up with the money.  Triche was a shareholder in First Bank and had a personal relationship with its president.  When First Bank demanded more collateral from Buhler, Triche instructed Buhler to pledge the AIG inventory purchased with the investors' funds to First Bank to "secure" his debt.  Triche knew that the investors were promised a first lien on the

inventory and discussed the issue in meetings with First Bank. Triche came to Buhler's office to help prepare the AIG inventory for presentation to First Bank. Glaspie questioned Triche as to whether re-pledging the inventory to First Bank was legal and Triche said that the inventory didn't belong to the investors and that this was done all the time. Buhler told Glaspie that if "Wayne [Triche] said it was okay. I guess it's okay." On May 3, 2004, two days before Buhler received the final AIG investment, he wrote to First Bank agreeing to pledge AIG's inventory as collateral for his existing debt and in return for a line of credit for AIG. He pledged AIG's inventory to First Bank on August 20, 2004 and First Bank's successor foreclosed on the inventory one year later.

The district court's (implied) determination that Triche controlled Buhler was not clearly erroneous. Buhler testified, in sum, that: he was dependent on Triche to get him out of debt; Triche advised him to get back into the auction business; Triche contributed and approved the financial concepts detailed in the prospectus; Buhler checked in with Triche after every investment; during the time Buhler was soliciting investments, Triche conducted meetings with his friends at First Bank to find a solution to satisfy Buhler's million dollar debt; Triche discussed the AIG inventory that was promised to the investors with First Bank; Triche instructed Buhler to pledge AIG's inventory to First Bank; and Buhler, relying on Triche, obliged. The evidence permits a finding that Triche effectively controlled Buhler in the creation of AIG, drafting of the relevant portions of the AIG pool document, soliciting of loans from investors, and pledging of AIG's inventory to First Bank.

To be sure, there is also evidence suggesting that Triche was only peripherally involved, at least in the formation of the prospectus and at the fundraising stage. Buhler testified that AIG was his business and that Triche

was an "advisor." Out of the "twenty or thirty" meetings between Buhler and DeArmond relating to the AIG pool document, Triche attended only "three or four." Triche knew the prospectus would be used to raise money, but never explicitly directed Buhler to collect funds. And, although Buhler testified that he notified Triche every time he obtained a loan from an investor, Buhler did not say that Triche offered anything more than "great job" in response.

Whatever we would have made of these potentially conflicting inferences in the first instance, the clear error standard "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985). When "the district court is faced with testimony that may lead to more than one conclusion, its factual determinations will stand so long as they are plausible—even if we would have weighed the evidence otherwise." *Nielsen v. United States*, 976 F.2d 951, 956 (5th Cir. 1992). In other words, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574. Because the district court's interpretation of the evidence was certainly plausible, Triche's sufficiency argument fails.

Triche's reliance on *Solow v. Heard McElroy & Vestal, L.L.P.*, 44,042 (La. App. 2 Cir. 4/8/09); 7 So. 3d 1269, is misplaced. In *Solow*, the Louisiana Court of Appeals held that a CPA firm that served as a seller's auditor did not exercise control over the seller. The court found that the auditor's power "to authorize the release of its [audit] opinion on [seller's] financial statements" and "failure to ensure that its draft [audit] opinion was withdrawn from the . . . 10-K filings" did not endow the CPA firm with the requisite "power to direct the management and policies" of the seller. *Id.* at 1281 (citing La. Rev. Stat. Ann. § 51:702(4)). While this is surely a correct interpretation of the control

person statute, plaintiffs did not allege that Triche controlled Buhler in his capacity as the CPA for AIG. *Solow* has no bearing on the factual scenario presented at trial. Under any interpretation of the evidence, Triche's relationship with Buhler and involvement with AIG went far beyond the auditing services at issue in *Solow*. As detailed above, the court could reasonably have found that Triche was extensively involved with Buhler and AIG, and that Buhler would not have created AIG, solicited investments, or pledged the inventory promised to the investors to First Bank without Triche's instruction or approval.

On appeal, Triche does not challenge or brief the insufficiency of the evidence as to any of the other elements of plaintiffs' state law claim under Section 712. Triche does assert that there is insufficient evidence to find that he had scienter under Rule 10b-5, but, as discussed above, the district court did not find him liable under the federal statute.[19] To the extent that Triche intended to make the same challenge to his liability under the Louisiana Securities Law, it is waived. *See United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010) ("A party that asserts an argument on appeal, but fails to adequately brief it, is deemed to have waived it." (citation omitted)).

Notwithstanding this waiver, the jury could have reasonably concluded, as it did, that Buhler and Triche acted with scienter. Plaintiffs' theory of the case was that Triche oversaw Buhler's creation of AIG and solicitation of funds with the intent to convince Buhler to pledge those funds to First Bank, in which

---

[19] Because Triche's liability under the federal statute is not properly before the court, Triche's sufficiency-of-the-evidence challenges relating to reliance and "temporal connexity" under Rule 10b-5 are also inapposite. As discussed *supra*, reliance is not an element of a claim under the Louisiana Securities Law. Triche's insistence that the prospectus's lack of an explicit attribution of the false statements or omissions to him defeats any claim of reliance is thus a consequence of his continued misunderstanding of the elements of the state law claim.

he had a substantial financial interest.[20]  Given the close proximity in time between the beginning of Buhler's solicitation of investors, meetings with First Bank, and subsequent pledge of collateral, and Buhler and Glaspie's testimony that the AIG inventory was assigned to First Bank at Triche's insistence, we cannot say that no reasonable jury could have found that Triche planned to pledge the inventory to First Bank and intentionally withheld this information from the prospectus.

Moreover, plaintiffs were not required to prove Triche's intent to commit fraud to find Triche liable under Section 714(B).  Plaintiffs needed only to show that Buhler, in the exercise of reasonable care, could have discovered the material omissions in the AIG pool document, and that Triche, as a control person, did not sustain his burden of proving that, in the exercise of reasonable care, he could not have known of the omissions or the facts rendering the omissions materially misleading.  *See* La. Rev. Stat. Ann. §§ 51:712 & 714.  In other words, although the burden is flipped, the showing needed to impose

---

[20] Triche also challenges as irrelevant the district court's admission of evidence related to his ownership of stock in First Bank and Buhler's pledge of inventory to the bank.  But this information was of course relevant to Triche's alleged motive in helping Buhler start AIG, solicit investments, and direct the pledge of collateral to the bank. The district court did not abuse its discretion in admitting evidence probative of whether Triche intended to mislead prospective investors.  Likewise, Triche's contention that the trial judge's comment to plaintiffs' counsel that "I've given you an opportunity to provide evidence of perhaps a motive, and I think you've done that," was prejudicial because it "inferred" to the jury that plaintiffs had established scienter is meritless.  As an initial matter, Triche did not object to the comment or request a curative instruction.  In any case, the statement does not indicate that plaintiffs successfully established a motive; the court stated only that plaintiffs had taken the opportunity—i.e., attempted—to do so.  Insofar as Triche claims that he was prejudiced because the district court inferred that the pledge of inventory was "relevant" to his scienter, this is a mere iteration of his challenge to the court's evidentiary ruling and is also denied.  Finally, these challenges again relate only to the Rule 10b-5 claim and therefore there is no relief to be provided.  The only issue that Triche has properly presented to this court related to his liability under Louisiana law is whether there was sufficient evidence from which the district court could conclude that he controlled Buhler.

primary liability on a seller and secondary liability on a control person under the Louisiana Securities Law is only negligence.   The court could have concluded, consistent with its judgment, that Buhler and Triche did not act with reasonable care in soliciting hundreds of thousands of dollars of loans and promising that the loans would be secured by inventory purchased with the money, while failing to disclose that Buhler was bankrupt, heavily indebted, and, at the very least, contemplating pledging the promised inventory to First Bank.   Indeed, Triche does not even argue that the omissions were not negligent.   Accordingly, Triche's claim that the evidence does not support the district court's judgment of liability under the Louisiana Securities Law fails.

**IV. Judgment on Rule 10b-5 Claim**

Finally, plaintiffs dedicate almost their entire brief to arguing that Triche is liable under Rule 10b-5 and, accordingly, that the "verdict of the jury on the Rule 10b-5 claim must be reinstated."   Plaintiffs contend that the district court erred in holding that the verdict supported liability solely under the state statute because only one use of an instrumentality of interstate commerce is required in connection with a scheme to defraud in a Rule 10b-5 action.

The district court denied plaintiffs' motion for joint and several liability on the grounds that they failed to "establish the requisite conspiracy" for its application under state law.   Thus, as the judgment stands, plaintiffs can collect only 40% of the damage award—the portion of liability the jury assigned to Triche.   But because the jury found that Triche acted "knowingly and with intent to deceive, manipulate, or defraud," if Triche is held liable for securities violations under Section 10(b) and Rule 10b-5, plaintiffs will be entitled to the imposition of joint and several liability, and will thus be able to enforce the judgment against Triche for the full damage award.   *See* 15 U.S.C. § 78u-4(f)(2)(A) ("Any covered person against whom a final judgment is entered in a

private action shall be liable for damages jointly and severally only if the trier of fact specifically determines that such covered person knowingly committed a violation of the securities laws.").

Whether or not plaintiffs are correct that the jury found the requisite elements to hold Triche liable under Rule 10b-5, this argument is not properly before us.  "[A]n appellate court may not alter a judgment to benefit a nonappealing party." *Greenlaw v. United States*, 554 U.S. 237, 244 (2008). Rather, "it takes a cross-appeal to justify a remedy in favor of an appellee." *Id.* at 244–45; *see also Art Midwest Inc. v. Atlantic Limited Partnership XII*, 742 F.3d 206, 211 (5th Cir. 2014) ("This circuit follows the general rule that, in the absence of a cross-appeal, an appellate court has no jurisdiction to modify a judgment so as to enlarge the rights of the appellee or diminish the rights of the appellant." (internal quotation marks and alteration omitted)).  It is true, of course, that an appellee, without filing a cross-appeal, may defend a judgment on any ground, including one rejected by the district court.  *See United States v. Am. Ry. Express Co.*, 265 U.S. 425, 435 (1924); *Hoyt R. Matise Co. v. Zurn*, 754 F.2d 560, 565 n.5 (5th Cir. 1985).  But here the district court entered a final judgment against Triche only on plaintiffs' state law claim, not their federal claim under Rule 10b-5.  Thus, plaintiffs do not merely seek to uphold the judgment on the Louisiana Securities Law claim, but to hold Triche liable under a separate federal statute.  To amend the judgment in this way, plaintiffs were required to file a cross-appeal.  *See Nw. Airlines, Inc. v. Cnty. of Kent, Mich.*, 510 U.S. 355, 364 (1994) ("A cross-petition is required . . . when the respondent seeks to alter the judgment below."); *Worthen v. Fidelity Nat. Prop. & Cas. Ins. Co.*, 463 F. App'x 422, 428 n.4 (5th Cir. 2012) (holding that where the district court granted summary judgment for plaintiff on his federal claim but dismissed his state-law claims, plaintiff needed to file a cross-appeal for consideration of his state-law claims).

Likewise, it is obvious that the district court erred in rejecting plaintiffs' motion for joint and several liability under Louisiana law for lack of evidence of a conspiracy.  Section 714(B) provides, right in the middle of the control person definition, that such a person "is liable jointly and severally with and to the same extent as the person liable under [Section 714(A)]."  La. Rev. Stat. Ann. § 51:714(B).  As Buhler was liable to plaintiffs as a seller of securities under Section 714(A), Triche should have been held jointly and severally liable for the total damage award under Section 714(B).  But, because plaintiffs have not cross-appealed (or even mentioned this issue in their brief), we are without jurisdiction to correct this error as well.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.